TELEDYNE WISCONSIN MOTOR, a Division of Teledyne Industries, Inc., a California Corporation, Plaintiff,

v.

LOCAL 283, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, et al., Defendants.

No. 74-C-585.

United States District Court,
E. D. Wisconsin,
Milwaukee Division.

Jan. 23, 1975.

Gary J. Okey, Foley & Lardner, Milwaukee, Wis., for plaintiff.

George F. Graf, Zubrensky, Padden, Graf & Bratt, Milwaukee, Wis., for defendants.

## MEMORANDUM

WARREN, District Judge.

This suit is brought by an employer, Teledyne Wisconsin Motor (hereinafter "Teledyne"), in an attempt to resolve a labor dispute concerning a refusal of certain of its production employees to work overtime hours. The employees at issue are members of Local 283, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (hereinafter "the union"); the union is a party defendant in this action.

This Court's jurisdiction over the subject matter of the controversy is alleged to exist by virtue of the provisions of §

301 of the Labor Management Relations Act, 29 U.S.C. § 185; in view of the provisions of § 4(a) of the Norris-La-Guardia Act, 29 U.S.C. § 104(a), whether the Court has jurisdiction to provide the injunctive relief requested is one of the material questions of law that have been argued by the parties.

## I. FACTUAL BACKGROUND

This lawsuit represents but one aspect of what appears to be a continuing struggle between the union and Teledyne to establish the nature of the arbitration procedures that are required under the collective bargaining agreements that have come into effect between them. The material facts giving rise to this particular suit are relatively few in number and are not substantially disputed.

The most recent collective bargaining agreement (hereinafter "the agreement") was executed in May of 1974 and has been in effect between the parties at all times material to this action; it includes some provisions for arbitration of disputes that arise between the parties, but it does not contain a "no-strike" clause to prohibit the union from engaging in work stoppage to press for concessions from the employer.

The plaintiff Teledyne is a manufacturer in the business of producing piston engines and employs members of the union to fill its requirements for both maintenance and production labor. For some time prior to November, 1974, Teledyne had been in the practice of regularly scheduling overtime hours for the employees represented by the union and had come to rely upon such overtime work in estimating production capacities; commitments for the sale and delivery of their product are based on an assumption that overtime help will be available from production and maintenance personnel.

The union has traditionally recognized this need for overtime assistance and maintains no general policy in opposition to either regularly scheduled or sporadic overtime work. The May, 1974 agreement states at paragraph 20.E.:

"E. It shall not be compulsory for any individual employee to work overtime. However, this provision may not be used by any department or group of employees to prevent the scheduling of a work week beyond forty (40) hours. Employees who are scheduled to work overtime and who chose not to work shall, whenever reasonably possible, advise their Foreman in advance of their not working."

The union takes a different position in regard to overtime labor by other than maintenance personnel when some of its members have been placed on layoff status by the employer. In this circumstance, other provisions of the agreement become relevant. At paragraph 46.A. the agreement states that:

"46. A. No employee shall regularly work more than forty (40) hours per week before all employees on the seniority list are re-employed. Maintenance work that cannot be performed during normal working hours, may be done on overtime hours."

It is this clause that has engendered the dispute here at issue; its provisions have come into question because, due to a severe reduction in the number of orders for its engines, Teledyne has been in the process of reducing its production output and has found it necessary to lay off certain of its employees that are represented by the union. On November 12, 1974, six union members were laid off; on November 27, 1974, approximately 220 additional employees represented by the union were laid off.

The current dispute between Teledyne and the union centers on an interpretation of the provisions of paragraph 46.-A.: Teledyne maintains that, by its terms, this clause imposes no limitation on the employer's right to schedule irregular and sporadic overtime work regardless of whether any union members are then on layoff status. The union on the other hand, takes the position that paragraph 46.A. requires a policy where-

by absolutely no overtime hours are to be worked by production personnel when any union members are on layoff status unless the employer makes a specific request in that regard and the union sees fit to authorize the added work time.

The union is currently enforcing its position by refusing to permit any overtime work to be done by those of its members who are engaged in production labor and by imposing penalties upon any of its members who do not refuse requests for overtime work that have not first received union approval.

The foregoing conditions have resulted in a veritable deadlock between the union and Teledyne: Teledyne refuses to take any employees off layoff status, and the union refuses to permit any of its production personnel to accept requests for overtime labor until such time as Teledyne removes some employees from layoff status.

The plaintiff claims that the problems engendered by the union's refusal to permit overtime work for production personnel has caused and will continue to cause it irreparable harm; it brings this action to secure an injunction against the union to foreclose further work stoppage and requests an order to compel the union to enter into arbitration to clarify the nature of the employer's right, if any, to schedule sporadic overtime labor under the provisions of paragraph 46.A.

On December 10, 1974, the plaintiff filed its complaint and petition for injunction; a memorandum in support of its position was filed on December 12, 1974. Pursuant to plaintiff's request, an evidentiary hearing was held before this Court on December 13, 1974. The defendant presented its position at this hearing and subsequently filed a supplemental brief as requested by the Court. The Court is of the opinion that sufficient information has been submitted so as to warrant a decision on the merits of the dispute at this time.

## II. THE PROPRIETY OF INJUNCTIVE RELIEF

### A.) *Prior Litigation.*

Initially the Court would note that it is aware of the prior litigation that has occurred in this district between these parties or their predecessors in interest. Teledyne Wisconsin Motor v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Local 283 et al., 318 F. Supp. 557 (E.D.Wis.1970). The Court would assure the parties that that decision will be given thorough consideration when it becomes relevant to the particular issues herein presented.

### B.) *The Prohibitions of the Norris-LaGuardia Act, 29 U.S.C. § 101, et seq.*

In regard to the plaintiff's requests for injunctive relief, the critical legal issues focus upon the prohibitions set forth in § 4(a) of the Norris-LaGuardia Act, 29 U.S.C. § 104(a):

"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

"(a) Ceasing or refusing to perform any work or to remain in any relation of employment; . . ."

By its very terms, this portion of the Act seems to prohibit the issuance of any injunctive relief in the dispute relevant to this action. The Court agrees with the prior caselaw that has established that a refusal to work overtime hours is employee activity within the protection of § 4(a); it indeed presents a situation where an end result is sought through a cessation of or a refusal to engage in work, within the meaning of § 4(a). *See, e. g.,* Elevator Manufacturer's Association of New

York v. International Union of Elevator Constructors Local No. 1 of New York and Vicinity, 342 F.Supp. 372 (S.D.N.Y., 1972).

The results of the 1970 litigation have no bearing on this conclusion in that Judge Gordon's opinion there expressly excludes consideration of the plaintiff's prayer for injunctive relief. Teledyne Wisconsin Motor v. International Union, etc., *supra* at p. 558.

■ Having decided that the Norris-LaGuardia Act is otherwise applicable, the Court must now determine whether the situation presented by the facts before the Court brings the case within a recognized exception to the broad proscriptions set forth in § 4(a).

C.) *The Recognized Exceptions to the Mandate of § 4(a) of the Norris LaGuardia Act.*

The plaintiff urges that the provisions of the Norris LaGuardia Act described above are inapplicable here by virtue of the effect of various recent decisions interpreting that portion of the Act: Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); Avco Corporation v. Local 787 of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), D.C., 325 F.Supp. 588, 459 F.2d 968 (3d Cir., 1972); and Inland Steel Company v. Local Union No. 1545, United Mine Workers of America et al., 505 F.2d 293 (7th Cir., 1974). For the reasons to be set forth in the following discussion, the Court cannot agree that the requirements of any of those recognized exceptions have been met in this action.

1.) The *Boys Markets* exception.

In *Boys Markets, supra,* the United States Supreme Court held that the anti-injunction provisions of the Norris LaGuardia Act did not prohibit a federal court from enjoining a strike where that strike was in direct violation of an express "no-strike" provision of a collective bargaining agreement then in effect between the parties and where both par-

ties to the suit were contractually bound to enter into binding arbitration as to the grievance or dispute that was the cause of the strike.

The agreement here at issue differs from the contract described in *Boys Markets* as to both of these two critical points: First, the agreement contains no provisions whereby the union has agreed to forego work stoppage to press for its claims—the "no-strike" clause is not present; secondly, the agreement contains no provisions which can be said to contractually bind the parties to arbitrate the differences that arise in regard to the interpretation of the agreement.

The procedures for arbitration of disputes between the parties are set forth at paragraphs 9 and 10 of the agreement; because of their length, they are fully reproduced as Appendix A to this opinion.

While these provisions clearly demonstrate the steps by which union complaints are to be processed, nowhere does it appear that the employer is to have the right to initiate arbitration as to a contention it may wish to press. The agreement clearly states that a dispute is to be referred to an arbitrator if it arises from an interpretation of the contract and if it fails to be satisfactorily concluded "in the above steps"; this language is a direct reference to paragraph 9 which, by its very terms, deals exclusively with employee-instituted complaints. Nowhere does the agreement specifically outline the procedure to be followed when the employer wishes to arbitrate a dispute. The Court must conclude that the contract at issue here creates what is in effect a sole option in favor of the union in regard to the question of when a particular disagreement is to be arbitrated.

This conclusion is supported by a review of the bargaining history leading to the agreement at issue here; such a review discloses that Teledyne attempted to have a clause included at paragraph 10.B. stating that,

"Either party shall have the right to request arbitration as outlined above. Should either party fail to request arbitration within the ten (10) work days after Step 4 meeting, such grievance shall be considered withdrawn."

While it is not determinative of the issue, the Court feels that the fact that this clause does not appear in the agreement that was finally executed between the parties at least fortifies the conclusion that Teledyne cannot initiate the arbitration process under the contract as it now stands.

While the employer has argued that it is impermissible to consider such extrinsic evidence, it seems clear that the Seventh Circuit has adopted the position that bargaining history may be considered where as here the meaning of a collective bargaining agreement is at issue. *See, e. g.*, Independent Petroleum Workers of America, Inc. v. American Oil Co., 324 F.2d 903, 907 (7th Cir., 1963), aff'd. by an equally divided court, 379 U.S. 130, 85 S.Ct. 271, 13 L.Ed.2d 333 (1964). The Court should note, however, that it is cognizant of the split of authority in this regard. *See, e. g.*, Communications Workers of America v. Southwestern Bell Telephone Co., 415 F. 2d 35, 40 (cases cited at Note 10) (5th Cir., 1969); Local No. 1434, I. B. E. W., AFL–CIO v. E. I. duPont de Nemours & Co., et al., 350 F.Supp. 462 (E.D.Va., 1972).

What has been said to this point would support a finding that only the union had the right to institute the arbitration process in the agreement at issue here; such a finding would preclude the existence of a mandatory arbitration procedure and thereby preclude the applicability of the decision in *Boys Markets*.

While the Court would conclude that it is inappropriate to adopt the theories of *Boys Markets* in this case, the Court need not rest such a decision solely on the ground that the union has the only right to compel arbitration for there exists another and more fundamental rea-

son why *Boys Markets* is not controlling here: The agreement states, at paragraph 10, that an unresolved dispute "may" be referred to an arbitrator. In addition to the fact that the union seems to have the sole option to initiate the arbitration procedure, the Court is of the opinion that this rather equivocal language as to when arbitration is to occur can in no way be construed to effect a contractual duty that binds both parties to enter into arbitration of the disputes arising under the agreement. Absent such a binding arbitration procedure, the agreement at issue here cannot be governed by the decision in *Boys Markets*.

### 2.) The *Avco* interpretation of *Boys Markets*.

The plaintiff urges that the absence of a mandatory arbitration procedure is not relevant to the exception set forth in *Boys Markets* by virtue of the decision in the *Avco* case, *supra*. In *Avco*, the circuit court held that a procedure for arbitration similar to that presented here was mandatory within the meaning of Boys Markets. While the union there, too, had the choice of whether to initiate arbitration, the Court found that it was precluded from work stoppage by the terms of a "no-strike" clause. Based upon this fact, the Court concluded that both parties were contractually "bound" to arbitrate despite the union's option to initiate arbitration because, by the terms of their contract, once the union decided to resolve a dispute, it was necessary for it to proceed by means of arbitration rather than work stoppage, and once the union chose to arbitrate, the employer was bound to follow.

"All that *Boys Markets* requires is that 'both parties are contractually bound to arbitrate.' 398 U.S. [235] at 254, 90 S.Ct. [1583] at 1594 [26 L. Ed.2d 199], quoting [Sinclair Refining Co. v. Atkinson] 370 U.S. [195] at 228, 82 S.Ct. 1328 [8 L.Ed.2d 440]. It does not require that both parties be capable of initiating arbitration.

In this case, the company is bound to arbitrate if the Union elects to pursue that remedy, and the Union is bound to arbitrate the disputes it desires to resolve rather than to resort to a strike. 398 U.S. at 248, 90 S.Ct. 1583." Avco Corp. v. Local Union # 787, etc., *supra*, 459 F.2d at 972.

In light of this language, the Court is of the opinion that the arbitration procedure here cannot be said to be "mandatory" within the meaning of the Avco decision: this union is not bound to resolve disputes, if at all, by arbitration; it is not precluded from work stoppage as an alternative to arbitration because it is not bound by a "no-strike" clause in this collective bargaining agreement.[1] That critical aspect of the contract at issue in *Avco* is missing here, and the Court feels that *Avco* does not authorize an inference of a mandatory arbitration procedure without it.

### 3.) The *Inland Steel* interpretation of *Boys Markets*.

The plaintiff next contends that an express "no-strike" clause is not required to meet the *Boys Markets* exception to the prohibitions of the Norris-LaGuardia Act, because a "no-strike" clause may be implied here by virtue of the decision in the *Inland Steel* case, *supra*. The Court notes, however, that a "no-strike" provision was implied in the *Inland Steel* case only because the dispute that was the basis of the work stoppage there was a dispute that the parties were contractually bound to arbitrate. In issuing an injunction through the rationale of *Boys Markets* the Court noted:

"Nor is it of any consequence that the collective bargaining agreement here does not contain an express no-strike clause, as was present in *Boys Markets*. . . . The reason is that 'a contractual commitment to submit disagreements to final and binding arbitration gives rise to an implied obli-

gation not to strike over such disputes.' " [citations omitted.] Inland Steel Co. v. Local Union No. 1545, United Mine Workers of America, *supra*, 505 F.2d at p. 299.

The Court has determined that it cannot be said that the agreement here contains such a mandatory arbitration procedure; absent such provision, the Court cannot imply a "no-strike" clause as was done in the *Inland Steel* decision.

### 4.) Summary: *Boys Markets*, *Avco*, *Inland Steel*.

Simply put, the result of this rather tedious analysis is as follows: To avoid the anti-injunction provisions of § 4 of the Norris-LaGuardia Act, the plaintiff must qualify for an exception thereto in terms of *Boys Markets* and its progeny. Because the agreement at issue here has neither a no-strike clause nor a mandatory arbitration procedure, it cannot qualify under the *Boys Markets* decision. A no-strike clause cannot be implied in terms of the *Inland Steel* decision because the arbitration procedure is not one to which both parties are contractually bound; a mandatory arbitration procedure cannot be said to be present under the *Avco* decision in that the requisite no-strike clause is not present.

Because the *Boys Markets* theory is therefore not applicable to this case, the Court must conclude that § 4 of the Norris-LaGuardia Act is controlling; this Court has no jurisdiction to enjoin or restrain the union activity here at issue.

## III. THE PROPRIETY OF AN ORDER TO COMPEL ARBITRATION

██ In addition to the requests for injunctive relief described above, the plaintiff in this case urges that this Court order the parties to enter into arbitration of those issues upon which the dispute in this case is based. For the

---

1. The plaintiff contends that the agreement does contain a "no-strike" clause at ¶ 20.E. (see Part I, supra). The Court feels that the provision refers to overtime scheduling and does not constitute a no-strike clause within the meaning of the *Avco* decision.

reasons that follow, the Court feels that such a course of action would be improper at this time.

### A.) *Prior Litigation*

As stated above, Judge Gordon has issued an opinion in a prior case involving a similar dispute between these parties or their predecessors in interest; there as here the plaintiff sought to obtain an order to compel arbitration. The Court notes that the wording of the arbitration clause in the collective bargaining agreement now in effect between these parties is almost a verbatim duplicate of the arbitration clause at issue in that 1970 litigation. As heretofore described, paragraph 10.A of this agreement provides in pertinent part:

> "10. A. Should any dispute, differences, or grievances arising because of interpretation of the contract fail to have been concluded in the above steps within ten (10) working days after the reduction to writing in the manner herein and above provided, the matter may be referred to a mutually agreed upon arbitrator . . ."

In his analysis of the motion to compel arbitration then before him, Judge Gordon focused upon the word "may" in this clause and concluded that the mere existence of a dispute in regard to interpretation of the agreement could not be said to establish a right to automatic arbitration. On that basis it was held that Teledyne was not entitled to an order to compel the defendant to engage in arbitration. Unlike 70–C–435, this case does not involve a situation where amended pleadings are to be filed by any of the parties; the Court must now determine whether this distinction is sufficient to warrant a conclusion different from that of the prior litigation.

### B.) *Other Case Law*

After consideration of other case law relevant to this issue, the Court concludes that the discretionary nature of the language of the arbitration clause in this agreement precludes compelled arbitration under the facts of the case at bar.

In the *Avco* case, *supra,* the Court was very careful to note that it was not engaging in any judicial "rewriting" of the agreement in dispute there: That agreement gave the union the sole option to initiate arbitration, and the Court found that the injunction it was to issue was not in derogation of that right because it would not give the employer a similar option.

> "Thus, the Union concludes, to grant the injunction would be to permit Avco the right to initiate the arbitration, a right Avco allegedly relinquished when it negotiated the contract. Such an interpretation reads too much into the prayer. The grant of an injunction encompassing this request would not order that arbitration occur, but only that the Union not strike and that Avco submit to arbitration according to the contract if and when the Union chooses to pursue that remedy." Avco Corp. v. Local Union No. 787, etc., 459 F.2d at pp. 972, 973.

Here, as in the *Avco* case, there exists a situation where the union is to have sole authority to initiate the arbitration process; the Court has determined that paragraphs 9 and 10 of the agreement so provide. *See* Appendix A. The Court is unwilling to "rewrite" the agreement to give the employer certain rights which it could not otherwise obtain; no order to compel arbitration will issue at the plaintiff's insistence.

## IV. CONCLUSION

■ In concluding, the Court would indicate that it is well aware of the general policy that prevails in the federal courts in favor of arbitration of labor disputes. Judge Campbell, speaking for a Seventh Circuit panel, reiterated this attitude in the *Inland Steel* case only last October:

> "We further believe that this conclusion [of compelled arbitration] is enhanced by the strong public policy

in favor of arbitration which was persuasively enunciated in the Steelworkers Trilogy [citations omitted]. The often discussed presumption of arbitrability for labor disputes was recently reaffirmed by the Supreme Court in Gateway Coal Co. v. Mine Workers, 414 U.S. 368, [377–380, 94 S.Ct. 629, 636–638,] 38 L.Ed.2d 583, 592–593 (1974). While the arbitrability of the disputes involved here may not be free from doubt, the Trilogy has instructed that all such doubts be resolved in favor of arbitration." Inland Steel Co. v. Local Union No. 1545, United Mine Workers of America, et al., supra, 505 F.2d at p. 298.

 This Court would note that it stands in full accord with the position outlined above and would· resolve all doubts in favor of arbitration if any doubts existed. The Court feels bound by the statutes and case law relevant to this dispute, however, and therefore must reluctantly refrain from either compelling arbitration or from ordering injunctive relief at this time.

While arbitration might well put an end to what has become a dispute based upon pride and principle as well as contract interpretation, and while arbitration would seem to be the means to effect a solution with benefit for both parties involved here, the provisions of the Norris-LaGuardia Act stand to preclude that result in this case.

For the reasons articulated in this memorandum opinion, the Court finds that it has no jurisdiction to grant the injunctive relief requested and that it must deny the plaintiff's plea for compelled arbitration; the above-entitled case is hereby ordered dismissed.

## APPENDIX "A"

### GRIEVANCE PROCEDURE

9. Should grievances arise between the Company and the Union, the following procedure shall be utilized:

STEP 1.

The employee wishing to present a grievance shall first contact his shop Steward and with him present the grievance. The Foreman shall make his verbal disposition no later than three (3) working hours after presentation. Should the grievance be reduced to writing, then the Foreman shall place his disposition as soon as possible but in no event later than twenty-four (24) hours (exclusive of non-working days) after it was presented.

STEP 2.

Grievances not resolved in step one shall be submitted by the Chief Steward or Assistant Chief Stewards on all shifts, to the General Foreman or Superintendent or Assistant Superintendent for disposition. A Written Disposition shall be made within forty-eight (48) hours.

STEP 3.

Grievances not resolved in Step two or Union Policy grievances shall be submitted for discussion to the next meeting of the Grievance Committee and the Labor Relations Representative of the Company. If such grievances are not resolved, they shall be referred to Step Four with a disposition placed thereon.

On Grievances that reach the Third Step, either party in that or subsequent steps may request of the other party that they place into writing their specific position on any particular grievance, listing the provisions of the contract they allege is involved.

STEP 4.

Grievances not resolved in Step three shall be submitted to a meeting of the Union Bargaining Committee, Representatives of the Union, and Representatives of the Company. All time spent in such meetings shall be considered Bargaining and any persons necessary at such meetings shall be paid by the Company at A.E.R. Such lost time shall not be charged against normal Union activity time or the allotted lost time pool.

10. A. Should any dispute, differences, or grievances arising because of interpretation of the contract fail to have been concluded in the above steps

**1240**

within ten (10) working days after the reduction to writing in the manner herein and above provided, the matter may be referred to a mutually agreed upon arbitrator, and if the parties cannot agree upon an arbitrator within five (5) work days after written notification of intent to arbitrate is given, the appointment of an arbitrator shall be requested of the Federal Mediation and Conciliation Service, Wisconsin State Industrial Commission, or Wisconsin Employment Relations Board. The Arbitrator shall have no authority to change any provision of this contract and shall have no power to decide any matter, the disposition of which Step 4 occurred more than six (6) months prior to submission to arbitration, provided the Company gives notice of such pending grievances at least thirty (30) calendar days prior to the expiration of the six (6) month period. The fees of the arbitrator and his expenses, if there are such expenses, shall be shared equally by the Company and the Union.

B. The decision of the Arbitrator shall be final and binding on both parties.