KEARNY PBA LOCAL # 21, AN UNINCORPORATED ASSOCIA-
TION OF NEW JERSEY, PLAINTIFF-APPELLANT AND
CROSS-RESPONDENT, v. TOWN OF KEARNY, A MUNICIPAL
CORPORATION OF NEW JERSEY, DEFENDANT-RESPON-
DENT AND CROSS-APPELLANT.

TOWN OF KEARNY ET AL., PLAINTIFF-RESPONDENT AND
CROSS-APPELLANT, v. KEARNY PBA LOCAL # 21, DE-
FENDANT-APPELLANT AND CROSS-RESPONDENT.

Argued March 19, 1979—Decided July 31, 1979.

*Mr. David Solomon* argued the cause for appellant-cross-respondent (*Messrs. Schneider, Cohen & Solomon*, attorneys; *Mr. J. Sheldon Cohen*, on the briefs).

*Mr. Norman A. Doyle, Jr.* argued the cause for respondent-cross-appellant.

The opinion of the court was delivered by
SCHREIBER, J.

The general subject matter of this appeal concerns an arbitrator's award involving a dispute between public employees and a municipality arising out of the interpretation of their collective bargaining agreement. Its judicial voyage commenced when Kearny P.B.A. Local # 21 (PBA) filed a complaint to confirm

an arbitration award granting overtime pay for standby time to members of the Town of Kearny Police Department. Shortly thereafter, the Town filed a complaint seeking to set aside the award. The matters were heard together and the trial court affirmed the award. Upon appeal the Appellate Division held that the arbitrator "imperfectly executed" his powers and modified the award by granting overtime only to those police who were not residents of Kearny. 159 *N.J.Super.* 402 (1978). We granted PBA's petition for certification in which it requested overtime pay for all police, resident and nonresident, and the Town's cross-petition which sought to disallow pay for all irrespective of residence. 78 *N.J.* 406 (1978).

The essential underlying facts in this proceeding are virtually undisputed. On October 11, 1976, certain employees of the Town of Kearny went on strike. Almost immediately thereafter the chief of police issued the following directive to the police:

Due to the fact that all Town employees other than the Police Department, will take part in a "job action" effective 7:00 p. m. Monday, October 11, 1976, the members of this Department are hereby directed to remain on a standby basis until further notice, and are not to leave the Town of Kearny.

The chief's order was effective until lifted at noon on October 15, 1976. Violation of the directive would have subjected a police officer to disciplinary action.

PBA claimed that the police officers who had remained on standby were entitled to compensation for overtime pursuant to the contract which PBA, as the sole and exclusive representative of the members of the Kearny Police Department (except the police chief and deputy chiefs) had entered into with the Town. The agreement governed various terms and conditions of employment including, among others, hours of work and overtime. It also contained a two-step grievance procedure, grievances consisting of any complaint with respect to wages, hours of work, or other conditions of employment. If at the conclusion of the grievance procedure the matter had not been satisfactorily resolved, either party could demand arbitration, the New Jersey Public Employment Relations Commission being desig-

nated to select an arbitrator. The arbitrator's decision had to be in writing and was to include the reasons for his findings and conclusion. The agreement also provided the decision was to be final and binding on both parties.

When the Town refused to make any payment for the standby service, PBA unsuccessfully processed the dispute through the grievance procedure and then demanded arbitration. The arbitration was heard at the Kearny Town Hall on March 25, 1977. Both sides were afforded an opportunity to have witnesses testify and present other evidence. No stenographer was present and the proceedings were not transcribed. However, the arbitrator's decision reflects that the parties stipulated to the facts previously recited. In addition, the parties agreed that payment for the standby at overtime rates would cost the Town between $80,000 and $120,000. The arbitrator's decision also indicates that the arbitrator had the contract before him.

The Town contended that the police were never required to report during the standby period and further argued that the contract contained no provision for standby compensation. It claimed that the parties understood that there was to be no payment for standby service inasmuch as PBA had unsuccessfully sought an express standby provision during contract negotiations. Therefore, it contended that PBA could not obtain through arbitration what it had not achieved in negotiations.

PBA argued that the contract covered all the police officers' working terms and conditions. The agreement provided for a workday not to exceed eight consecutive hours in a 24-hour period, and for overtime pay for hours worked beyond eight. PBA rationalized that standby represented working time in excess of the regular workday and therefore the police were entitled to overtime.

The arbitrator reasoned that an employee is entitled to compensation for hours worked beyond agreed upon periods. He found that once the employer mandates that the employee

cannot enjoy freedom of movement during nonworking hours, the employee is on duty. The arbitrator also recognized that public employees may be required to work beyond their normal work hours, particularly when emergencies arise. When that occurs, the employee is entitled to compensation.

The arbitrator did not find that PBA's failure to gain an express standby provision in the agreement led to a different result. He believed that because the PBA proposal advanced during collective negotiations sought standby compensation when the employee was required "to be on standby at home" and, since the chief of police's directive ordered them "not to leave the Town of Kearny," the Town's argument was wanting, for the two standby conditions were not the same. He stated that, if the police chief's order had omitted that limitation, the Town would prevail. That not being so, he concluded the Town had breached the agreement and that the police should be compensated at overtime rates for hours in excess of the eight-hour workday in each 24-hour period between 8:40 p. m. on October 11, 1976 (when the directive was issued) and 12:00 noon on October 15, 1976.

The trial court agreed with the reasoning of the arbitrator and confirmed the award. It also rejected the Town's claim that the award granted recovery to police who may have been on vacation or on sick leave, noting that the arbitrator justly assumed that each member of the police department was on regular duty during that four-day period in October. The Town had offered no evidence to refute that assumption.

The Appellate Division reexamined the arbitrator's reasoning. Emphasizing that the arbitrator had agreed that PBA could not obtain in arbitration what it was denied at the negotiating table, the Appellate Division seized on what it considered an inconsistency in the arbitrator's reasoning. The arbitrator assumed that the police would not have been entitled to pay if they had been ordered to stand by at home, and, yet, he ordered that police who were residents of the Town were entitled to overtime pay

when forced to stand by under the less restrictive requirement that they remain within the municipal limits. The Appellate Division found that the inconsistency of awarding compensation for time involving lesser restrictions with respect to resident policemen conflicted with the arbitrator's apparent intent, as reflected in his decision, to compensate for standby time spent under a greater restraint than that contained in the contract proposal. On the other hand, nonresidents were required by the police chief's directive to remain within the Town. This was a more severe limitation than being confined to one's home beyond the municipality's borders, and thus granting them overtime pay accorded with the arbitrator's intent. Accordingly, it affirmed the award as to nonresident policemen but set it aside as to residents.

We have heretofore recognized that what may be submitted to binding arbitration in the public sector is circumscribed. Unlike the private sector, prerogatives of management, particularly those involving governmental policy making, cannot be bargained away to be determined by an arbitrator. *Tp. of W. Windsor v. Public Employment Rel. Comm.*, 78 *N.J.* 98, 115 (1978). The underlying reason for this position is founded on the concern of delegating such power to a private person. Justice Pashman acknowledged as much in *Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed.*, 78 *N.J.* 144 (1978), when he wrote:

> To be constitutionally sustainable, a delegation must be narrowly limited, reasonable, and surrounded with stringent safeguards to protect against the possibility of arbitrary or self-serving action detrimental to third parties or the public good generally. [*Id.* at 164]

See also *Bernards Tp. Bd. of Ed. v. Bernards Tp. Ed. Ass'n*, 79 *N.J.* 311, 321–322 (1979).

Furthermore, the arbitrator in resolving disputes in the public sector must comply with certain standards and criteria. Some of these have previously been referred to in our case law. In *Division 540, Amalgamated Transit Union, AFL–CIO v. Mercer County Improvement Auth.*, 76 *N.J.* 245 (1978), Justice Sullivan

noted that an arbitrator "must consider the public interest and the impact of his decision on the public welfare. He must act fairly and reasonably to the end that labor peace between the public employer and its employees will be stabilized and promoted. He must make findings which are adequate, and sufficient to support the award." *Id.* at 252. He held that these inherent standards and criteria would be deemed to be incorporated in the compulsory arbitration provisions of a statute governing a county improvement authority and its employees, *N.J.S.A.* 40:37A–96.

In *New Jersey State Policemen's Benevolent Ass'n Local 29 v. Town of Irvington,* 80 *N.J.* 271 (1979), in discussing the significance of a statutory limitation on a municipality's expenditures, *N.J.S.A.* 40A:4–45.1 *et seq.,* with respect to an arbitrator's resolution of a dispute between the municipality and its police force (the arbitration being compulsory, *N.J.S.A.* 34:13A–16), Justice Pashman pointed out that even in the absence of an express statutory provision an "arbitrator's consideration of a town's Cap situation is mandated by the constitutional proscription against undue delegations of legislative authority to private individuals." *Id.* at 293.

In the companion case of *City of Atlantic City v. Laezza,* 80 *N.J.* 255 (1979), decided the same day, voluntary but binding arbitration of disputes between public employees and a municipality was involved. We held that:

> In our view, the constitutional prohibition of undue delegations of legislative authority mandates that this factor also be considered where arbitral proceedings have been voluntarily initiated by the parties. * * * By permitting local authorities to submit negotiation impasses to binding interest arbitration, *see N.J.S.A.* 34:13A–7, the Legislature has in effect allowed municipalities to delegate to an arbitrator the power to fix the terms and conditions of employment of local government workers. Were the arbitrator free to ignore the municipality's Cap Law constraints in rendering a decision, serious damage to the "public good" might ensue. An exceedingly high award would force the municipality to lay off large numbers of employees or in other ways necessitate drastic cutbacks in services—moves which would undoubtedly cause hardships to municipal residents. * * *

Therefore, an arbitrator must consider a town's Cap situation prior to the rendition of an award. Should he fail to do so, that award would be subject to vacation on grounds of procurement by "undue means." *N.J.S.A.* 2A:24–8(a). [*Id.* at 269]

In the context of public employment an arbitrator's determinations in binding arbitration are subject to pertinent statutory criteria as well as the public interest and welfare.[1] In the private sector, the parties may authorize the arbitrator to determine legal issues as he deems fit irrespective of whether those determinations are in accordance with the law. The source of the arbitrator's authority is the agreement and his "function is to comply with the authority the parties have given him in the agreement." *Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed., supra,* 78 *N.J.* at 155. When the parties intend that their contract be interpreted in accordance with the law, his authority is circumscribed by being limited to carrying out that intent. *In re Arbitration Between Grover and Universal Underwriters Ins. Co.,* 80 *N.J.* 221, 230–231 (1979). However, in the public sector the parties do not have this choice, for public policy demands that inherent in the arbitrator's guidelines are the public interest, welfare and other pertinent statutory criteria.

PBA has strongly advocated that the arbitrator's award must be accepted at face value, and that unless error appears on the face of the award, it must be confirmed.[2] In support of that

---

[1]There is no meaningful distinction between interest and grievance arbitrations, for in both situations a third person, not accountable to the public, is empowered to decide the issues presented. Grievance arbitration, which usually involves any disputes between the parties, including but not limited to interpretation of the contract, may also implicate the same standards and the public impact may be as significant as in an interest dispute. This is particularly possible when an arbitrator is held to have been authorized to decide a dispute as he feels just or the subject has not been covered by the agreement.

[2]It even contended that a court may not examine the arbitrator's opinion to determine if the arbitrator committed any error justifying disallowance of the

proposition reference has been made to some decisions in the private sector which could be read as expressing that thought. See, *e. g.*, *Daly v. Komline-Sanderson Engineering Corp.*, 40 *N.J.* 175, 178 (1963); *Carpenter v. Bloomer*, 54 *N.J.Super.* 157, 168 (App.Div. 1959). On the other hand, under appropriate circumstances courts have gone beyond the arbitrator's award and opinion to ascertain whether a statutory basis for vacating an award exists. Perhaps this apparent inconsistency may be explained when we consider judicial reviews of arbitrations before statutory codification occurred. Prior to that codification, a difference existed in setting aside an arbitrator's award in law and in equity.

As stated in Justice Story's *Commentaries on Equity Jurisprudence* :

> In cases of fraud, mistake, or accident Courts of Equity may, in virtue of their general jurisdiction, interfere to set aside awards upon the same principles and for the same reasons which justify their interference in regard to other matters where there is no adequate remedy at law.
>
>      \*      \*      \*      \*      \*      \*      \*      \*
>
> It is well known that when a suit is brought at the common law upon an award, no extrinsic circumstances or matter of fact dehors the award can be pleaded or given in evidence to defeat it. \* \* \* But Courts of Equity will in all such cases, grant relief, and upon due proofs will set aside the award. [2 *J. Story, Commentaries on Equity Jurisprudence* 787–790 (13th ed. 1886)]

New Jersey enacted a general arbitration law when it adopted "An Act for Regulating References, and Determining Controversies by Arbitration" on December 2, 1794 which provided that arbitration awards were to be enforced in law or equity unless the arbitrators misbehaved themselves and the award was "procured by corruption or other undue means." *Laws of New Jersey*

---

award. For a contrary view, see *Bell v. Price*, 21 *N.J.L.* 32, 34 (Sup.Ct. 1847), aff'd 22 *N.J.L.* 578 (E. & A. 1849); *Wm. J. Burns Int'l Detective Agency, Inc. v. N.J. Guards Union, Inc.*, 64 *N.J.Super.* 301, 312–313 (App.Div. 1960), certif. den. 34 *N.J.* 464 (1961).

158, 159 (1821). Thus, the statutory grounds for setting aside an award were the same in both law and equity. Yet, the courts continued to adhere to the notion that the remedial, including evidential, difference between law and equity remained.

References to this distinction may be found in some of our decisions. See *Sherron v. Wood*, 10 *N.J.L.* 7, 18 (Sup.Ct. 1828) (separate opinion), where Justice Ford stated that nothing extrinsic to an award can be offered in evidence in a court of law; "the only relief is in equity." In *Hoagland v. Veghte*, 23 *N.J.L.* 92, 96–97 (Sup.Ct. 1851), the court stated parol evidence could not be admitted in an action at law to show an arbitrator exceeded his authority, but that the remedy to correct a gross error or mistake not apparent on the face of the award was in equity. In *Ruckman v. Ransom*, 35 *N.J.L.* 565 (E. & A. 1871), Chief Justice Beasley reconsidered the rule stated in *Hoagland v. Veghte* that review in the action at law was limited to the face of the award, except when the arbitrators neglected or refused to consider a matter submitted to them. Recognizing that the law rule sometimes led to harsh results (the result in *Hoagland v. Veghte* was to make the defendant pay twice for the same damage), the Chief Justice significantly remarked that

the remedy for a usurpation of jurisdiction, as well as for fraud or other misbehavior, is in a court of equity.

  *  *  *  *  *  *  *  *

That these frauds and errors can be relieved against or corrected is, of course, not questioned, the inquiry being merely as to the forum in which the remedy should be sought. The case of *Hoagland v. Veghte* maintains that such forum is not a court of common law, but is a court of equity, and, in my opinion, this doctrine is conformable to the line of common law authorities. [*Id.* at 572–573]

It frequently may be necessary to consider evidence extrinsic to the award to decide whether any of the statutory grounds for vacating the award exist. As indicated above, this had been the practice in courts of equity and, since the 1947 Constitution, Art. VI, § III, par. 4, vested equitable jurisdiction in the Superior Court, may now be found in the Chancery and

Law Divisions of the Superior Court. See *Barcon Assoc., Inc. v. Tri-County Asphalt Corp.*, 160 *N.J.Super.* 559, 562–563 (Law Div. 1978); *International Bhd. of Teamsters, etc., Local 560 v. Bergen-Hudson Roofing Supply Co.*, 159 *N.J.Super.* 313, 315–316 (Ch.Div. 1978); *Tave Constr. Co. v. Weisenfeld*, 82 *N.J.Super.* 562 (Ch.Div. 1964), aff'd 90 *N.J.Super.* 244 (App.Div. 1966). Accord *Korshalla v. Liberty Mutual Ins. Co.*, 154 *N.J.Super.* 235, 238–239 (Law Div. 1977); *Creter v. Davies*, 30 *N.J.Super.* 60, 64 (Ch.Div.), aff'd 31 *N.J.Super.* 402 (App.Div. 1954). It is appropriate and sensible that material, relevant and reliable evidence be made available to assist the courts in determining whether or not statutory grounds are available to set aside an award. In discharging this judicial responsibility to determine if statutory grounds are met, courts should not be entangled in some outmoded procedural rule of the common law courts. See *Evid. Rules* 1(1), 1(2) and 5. *Cf. LaStella v. Garcia Estates, Inc.*, 66 *N.J.* 297, 305 (1975), wherein we modified the old common law rule that an award to be valid had to be unanimously approved by the arbitrators, noting our willingness "to reject common law doctrines which have outlived their usefulness and which no longer serve justice or the interests of society."

The bases upon which awards may be set aside have remained essentially the same since the act of 1794 [3] and were last restated in the still viable arbitration act of 1923. *N.J.S.A.* 2A:24–1 *et seq.* Awards shall be vacated when they have been "procured by corruption, fraud or undue means," *N.J.S.A.* 2A:24–8(a), where the arbitrators have refused to hear pertinent and material evidence or committed other prejudicial "misbehaviors," *N.J.S.A.* 2A:24–8(c), or where the arbitrators exceeded or imperfectly executed their powers so that a mutual, final and definite award was not made. *N.J.S.A.* 2A:24–8(d).

---

[3] An act of February 10, 1819 authorized the issuance of subpoenas. *L.*1819, at 11. The revision of 1845 combined the acts of 1794 and 1819. 1845 *Revision*, at 113. The revision of 1877 restated the 1846 act. 1877 *Revision*, at 34.

An arbitrator's award is not to be cast aside lightly. It is subject to being vacated only when it has been shown that a statutory basis justifies that action. However, as we have previously pointed out, an arbitrator's award in the public sector should be consonant with the criteria peculiarly applicable in this area. No showing was made here that the arbitrator acted contrary to the inherent guidelines applicable to public sector arbitration. In that event (the underlying facts being virtually undisputed) the scope of judicial review is limited to determining whether or not the interpretation of the contractual language is reasonably debatable. See *Standard Oil Development Co. Employees Union v. Esso Research & Engineering Co.*, 38 *N.J.Super.* 106, 119 (App.Div.), sustained on rehearing 38 *N.J.Super.* 293 (App.Div. 1955). If so, then we should adhere to the parties' voluntary agreement to engage an arbitrator to resolve their dispute.

Applying this standard we are of the opinion that the arbitrator's award should be confirmed. The polestar of construction of a contract is to discover the intention of the parties. *Atlantic Northern Airlines, Inc. v. Schwimmer*, 12 *N.J.* 293, 301 (1953). This is what the arbitrator attempted to do here. His approach was consonant with settled law. Had the parties agreed that standby time was to be includable in computing the hours worked or not? That was the ultimate question.

Any number of interpretative devices have been used to discover the parties' intent. These include consideration of the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct. Several of these tools may be available in any given situation—some leading to conflicting results. But the weighing and consideration in the last analysis should lead to what is considered to be the parties' understanding. Individual interpretative rules should be subordinated

to that goal. See *Ace Stone, Inc. v. Tp. of Wayne*, 47 *N.J.* 431, 439 (1966), and cases cited.

The arbitrator concluded that the contract contemplated and the parties intended that all police, irrespective of where they resided, be treated the same. The soundness of this position is evident when the contract is examined in its entirety. See *Washington Constr. Co. v. Spinella*, 8 *N.J.* 212, 217 (1951). It can hardly be questioned that all policemen, resident and non-resident, were to be treated equally insofar as compensation was concerned. Such uniformity is displayed in every provision dealing with compensatory and fringe benefits. Clothing allowance, pensions, medical insurance, life insurance, holiday pay, are the same for residents and nonresidents. When the contract is taken as a whole, the parties' intent to treat all police alike is evident.

What occurred during negotiations frequently will throw light upon the parties' intent as expressed in the written contract. The Town argues that the agreement does not expressly provide for compensation for standby time and its refusal to include a contractual provision to that effect confirms its position that no one was entitled to payment for standby time. Its position is buttressed by the fact that the police officers received an annual salary which arguably included any standby time away from the work site, particularly when the hours were utilized predominantly for their own benefit. *Cf. In re Steel Service Mfg. Co.*, 22 *Lab.Arb.Rep.* (BNA) 613 (1954), where a driver who arrived at his destination at 7:30 p. m., too late for the truck to be unloaded, was held not to be entitled to compensation between 7:30 p. m. and the time he resumed work in the morning, despite having to spend the time at the location, the contract in question providing that the normal work period was eight consecutive hours to be followed by 16 hours of rest.

PBA countered the Town's contentions with a two-pronged argument. First, it claimed that the police were entitled to overtime for standby under the language of the agreement as

written but that it desired, for purposes of clarification, an express statement on the subject. But *cf., e. g., Teledyne Wisconsin Motor v. Local 283, UAW,* 386 *F.Supp.* 1231 (E.D.Wis. 1975), aff'd 530 *F.*2d 727 (7th Cir. 1976) (while not determinative, absence from collective bargaining agreement of company proposed clause fortifies conclusion that contract cannot be interpreted to include rejected provision). Alternatively, PBA asserted that the police chief's directive was not identical with the proposed contractual language, the former restricting all police to the municipal limits and the latter to their homes. Therefore, they were not obtaining in arbitration that which they had been unable to secure in negotiations. The arbitrator adopted this reasoning.

We find that the arbitrator's conclusions as to the parties' ultimate intent were justifiable. The contract limited the workday to not more than eight consecutive hours in a 24-hour period. It was further agreed that overtime pay was to be paid for overtime work, that is, "hours worked in excess of the regular workday consisting of eight consecutive hours in a twenty-four hour period or hours worked on his regularly scheduled day off, or during scheduled vacation periods." "Hours worked" did not necessarily mean that the police officer was to be actually engaged in rendering police services to receive that credit. For example, an employee was to be paid for a full hour for any portion of an hour worked overtime. When called in for overtime work, the officer was to be paid for no less than three hours irrespective of actual time worked. So, too, if the police officer had to appear in court on a day when he was off duty, he was to receive minimum pay for three hours. Finally, the contract provided that it "shall govern all wages, hours and other conditions of employment herein set forth."

A fair reading of the agreement makes it clear that the police officers were to work a certain basic number of hours consisting of not more than eight consecutive hours in a 24-hour period and their salary schedule was predicated upon that work period. If

they were called upon beyond the mandated eight-hour period, the contract contemplated that they be paid. Further, the agreement recognized that they were to be recompensed even though they may not have been actually working during an overtime period. Arguably, the parties' general intent, as expressed in the contract and as found by the arbitrator, indicated that the employees were to be paid when the employer substantially restricted their movements on what otherwise was free time.

■ We are satisfied that the arbitrator's findings as to the intent of the parties are fully supportable in the record. The interpretation of the contractual language is reasonably debatable and the conclusion he reached is fairly arguable. Under these circumstances, the award should be upheld.

The judgment of the Appellate Division is modified and that of the trial court confirming the award reinstated.

PASHMAN, J., concurring.

I concur in the result which the majority has reached and generally agree with its reasoning. I write separately to emphasize that today's decision, by endorsing the "reasonably debatable" standard of arbitral power, leaves unchanged the traditional limitations regarding judicial review of public employee grievance arbitration. Specifically, I wish to explain in greater detail why the majority has rejected the Township's contention that arbitration in the public sector should be scrutinized for substantial credible evidence present in the record.

I

Before turning to the substantive issue involved, it may be instructive to briefly summarize the nature of grievance arbitration. Grievance arbitration is a mechanism for resolving disputes concerning the interpretation, application or violation of an existing collective agreement. *See N.J.S.A.* 34:13A–5.3; *New Jersey State Patrolmen's Benevolent Ass'n Local 29 v.*

*Town of Irvington*, 80 *N.J.* 271 (1979). The arbitrator performs only two tasks: contract interpretation and factfinding. As such, grievance, as opposed to interest, arbitration does not involve a delegation of legislative power to the arbitrator. Rather, it merely constitutes a substitution by consent of the parties of an arbitral tribunal for the ordinary judicial process. That is, the parties voluntarily agree to have an arbitrator settle their disputes rather than bring a breach of contract action. *See, e. g., Carpenter v. Bloomer*, 54 *N.J.Super.* 157, 162 (App.Div. 1959); *Anco Products v. T V Products Corp.*, 23 *N.J.Super.* 116, 123 (1952); *Mount St. Mary's Hosp. v. Catherwood*, 26 *N.Y.*2d 493, 509, 311 *N.Y.S.*2d 863, 260 *N.E.*2d 508, 517 (Ct.App.1970) (grievance arbitration called quasi-judicial).

The advantage inherent in arbitration, from the viewpoint of the parties, is that it allows for "the final disposition, in a speedy, inexpensive, expeditious, and perhaps less formal manner, of the controversial differences between [them]." *Carpenter v. Bloomer, supra*, 54 *N.J.Super.* at 162. *See, e. g., IMO Arbitration between Wilmer Grover, Jr., et al.*, 80 *N.J.* 221, 233 (1979) (Pashman, J., dissenting); *N. J. Manu. Ins. Co. v. Haran*, 128 *N.J.Super.*, 265, 269 (App.Div.1974); *Eastern Eng. Co. v. Ocean City*, 11 *N.J.Misc.* 508, 510–511 (Sup.Ct.1933); *Utah Const. Co. v. Western Pac. Ry. Co.*, 174 *Cal.* 156, 159–160, 162 *P.* 631, 632–633 (Sup.Ct.1917); *McRae v. Superior Court*, 221 *Cal. App.*2d 166, 170, 34 *Cal.Rptr.* 346, 349 (Dist.Ct.1963); *Gaer Bros. Ins. v. Mott*, 144 *Conn.* 303, 130 *A.*2d 804 (Sup.Ct.E.1957); *First Nat. Bank v. Clay*, 2 *N.W.*2d 85 (Iowa Sup.Ct.1942); *Wilson v. Gregg*, 208 *Okl.* 291, 255 *P.*2d 517 (Sup.Ct.1953); *in re Smith*, 381 *Pa.* 223, 112 *A.*2d 625 (Sup.Ct.1955), app. dism., 350 *U.S.* 858, 76 *S.Ct.* 105, 100 *L.Ed.* 762 (1955); 5 *Am.Jur.*2d "Arbitration," § 1 at 518–519. The parties to a voluntary arbitration agreement are normally free to provide their own method of selecting the arbitrator or arbitrators to be employed. They are thus able to choose an individual whose judgment they respect and who may have special training or expertise in the area in controversy.

In order to effectuate the goal of providing an alternate forum for the speedy resolution of disputes, judicial interference with the arbitrator's role has been strictly limited. The grounds for vacating an arbitral award have been exclusively restricted to those set out in the pertinent statute, *N.J.S.A.* 2A:24–8.[1] *See, e. g., Deakman v. Odd Fellows Hall Ass'n, Inc.*, 110 *N.J.L.* 304 (E & A 1933); *Ukrainian Nat. Urb. Ren. Corp. v. Joseph L. Muscarelle, Inc.*, 151 *N.J.Super.* 386, 397 (App.Div.), certif. den., 75 *N.J.* 529 (1977); *Local Union 560 v. Eazor Express, Inc.*, 95 *N.J.Super.* 219, 227 (App.Div.1967); *Harsen v. Board of Ed. of W. Milford Tp.*, 132 *N.J.Super.* 365, 371 (Law Div.1975). Nowhere are courts authorized to vacate arbitral awards merely because the arbitrator's decision is not based upon "substantial credible evidence" present in the record. Quite the contrary, we have emphasized that it is the arbitrator who is to be the judge of the facts and his contractual interpretation is to be upheld if the language is open to reasonable debate. *See, e. g., Daly v. Komline-Sanderson Eng. Corp.*, 40 *N.J.* 175, 178 (1963); *Ukrainian Nat. Urb. Ren. Corp. v. Joseph L. Muscarelle, Inc., supra*, 151 *N.J.Super.* at 398; *Standard Oil Dev. Co. Emp. Union v. Esso Research Eng. Co.*, 38 *N.J.Super.* 106, 119 (App.Div.1955); *Harsen v. Board of Ed. of W. Milford Tp., supra*, 132 *N.J.Super.* at 374. This is because it is the arbitrator's judgment for which

---

[1]That statute provides, in pertinent part:

The court shall vacate the award in any of the following cases:

a. Where the award was procured by corruption, fraud or undue means;

b. Where there was either evident partiality or corruption in the arbitrators, or any thereof;

c. Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause being shown therefor, or in refusing to hear evidence, pertinent and material to the controversy, or of any other misbehaviors prejudicial to the rights of any party;

d. Where the arbitrators exceeded or so imperfectly executed their powers that a mutual, final and definite award upon the subject matter submitted was not made.

the parties have contracted. *See, e. g., Anco Products v. TV Products Corp.*, 23 *N.J.Super.* 116, 123 (1952); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 *U.S.* 593, 599, 80 *S.Ct.* 1358, 1362, 4 *L.Ed.*2d 1424, 1429 (1960).

## II

The Township urges us to depart from this well-established restrictive standard of judicial review. It contends that in any case involving a public employee, courts should be free to scrutinize the facts upon which the award is based and vacate that award if they consider the evidence insufficient. Such an approach would throw a monkey wrench into the gears of the grievance mechanism.

Under the Township's approach, the disappointed party to an arbitrated grievance would be encouraged to seek judicial review in hopes of gaining a reversal. Thus, another layer would be added to grievance procedures in which arbitration had been envisioned as the terminal step. This new layer would, of course, be attended by additional delay and expense. Arbitration would thus be converted into a springboard to litigation rather than remaining the end to it. *See, e. g., IMO Arbitration between Wilmer Grover, Jr. et al., supra*, 80 *N.J.* at 238 (Pashman, J., dissenting); *Igoe Bros., Inc. v. Nat'l Ben Franklin Fire Ins. Co.*, 110 *N.J.Eq.* 373, 377 (E & A 1932); *Ukrainian Nat. Urb. Ren. Corp. v. Joseph L. Muscarelle, Inc., supra*, 151 *N.J.Super.* at 401; *Collingswood Hosiery Mills v. American Fed. of Hosiery Workers*, 31 *N.J.Super.* 466, 473 (App.Div.1954); *Korshalla v. Liberty Mut. Ins. Co.*, 154 *N.J.Super.* 235, 240 (Law Div.1977). It is precisely for this reason courts in other jurisdictions have uniformly held that voluntary public employee grievance arbitration is to be subjected only to the traditional level of judicial

scrutiny. *See, e. g., School Comm. of W. Springfield v. Korbut,* 373 *Mass.* 788, 369 *N.E.*2d 1148 (Sup.Jud.Ct.1977); *Ferndale Ed. Ass'n v. School Dist. for Ferndale,* 67 *Mich.App.* 645, 242 *N.W.*2d 481 (Ct.App.1976); *State v. Berthiaume,* 259 *N.W.*2d 904 (Sup. Ct.Minn.1977); *Rochester City Sch. Dist. v. Rochester Teachers Ass'n,* 41 *N.Y.*2d 578, 362 *N.E.*2d 977 (Ct.App.1977); *Community Coll. of Beaver Cty. v. Community Coll. of Beaver Cty., Soc. of the Fac. (PSEA/NEA),* 473 *Pa.* 576, 375 *A.*2d 1267 (Sup.Ct.1977); *Joint Sch. Dist. No. 10 v. Jefferson Ed. Ass'n,* 78 *Wis.*2d 94, 253 *N.W.*2d 536 (Sup.Ct.1977).

The Township's argument for our departing from precedent is unconvincing. It contends that extensive review is necessary to prevent an undue delegation of legislative authority. However, as previously noted, grievance arbitration does not involve any delegation of power but, rather, merely replaces breach of contract actions with arbitral determinations.[2] Moreover, there is no reason to believe that arbitrators are any less competent than courts in discovering the intent of the parties and applying it to the facts of the particular case.

The precedents relied upon by the Township are equally unavailing. The more expansive standard of review espoused by *Div. 540, Amalgamated Transit Union, AFL–CIO v. Mercer Cty. Imp. Auth.,* 76 *N.J.* 245 (1978), was predicated upon the fact that the arbitration was compelled by statute. Justice Sullivan speaking for a unanimous Court there stated that:

> *Because it is compulsory,* principles of fairness, perhaps even due process, require that judicial review be available * * *.
>
> Also, *because the arbitration is imposed by law,* the judicial oversight available should be more extensive than the limited judicial review had under *N.J.S.A.* 2A:24–8 to parties who voluntarily agree to submit their dispute to binding arbitration. We conclude that *when* * * * *the arbitration process is compul-*

---

[2] In this respect, grievance arbitration differs from "interest" arbitration. *See infra* at 229.

sory, the judicial review should extend to consideration of whether the award is supported by substantial credible evidence present in the record. [*Id.* at 253–254 (emphasis supplied, citations omitted)]

*See Mount St. Mary's Hosp. v. Catherwood,* 26 *N.Y.*2d 493, 311 *N.Y.S.*2d 863, 260 *N.E.*2d 508 (Ct.App.1970) (compulsory interest arbitration involves substantial interference with property rights and due process therefore requires higher levels of scrutiny). Such stricter scrutiny is not mandated where, as here, the parties have submitted to arbitration of their own accord.

Our opinion in *Div. 540,* moreover, was concerned with "interest" arbitration rather than the grievance mechanism here at issue. In "interest" arbitration, the arbitrator is in fact empowered to create the terms of labor contracts to which municipalities would otherwise have to give their approval. It thus does involve a delegation of municipal (legislative) power to a third party, possibly justifying more expansive judicial scrutiny. In contrast, grievance arbitration merely involves the substitution of one third party—the arbitrator—for another—the courts.[3]

This fundamental difference between grievance and interest arbitration also distinguishes this case from *City of Atlantic City v. Laezza,* 80 *N.J.* 255 (1979) and *New Jersey State PBA, Local 29 v. Town of Irvington,* 80 *N.J.* 271 (1979). In any event, *Irvington* dealt with compulsory arbitration. Moreover, in *Atlantic City,* which did involve voluntary arbitration, we held merely that the arbitral award would be reviewed to determine whether the arbitrator had taken into account a municipality's Cap Law status, *see N.J.S.A.* 40A:4–45.1 *et seq.* Surely, this is a

---

[3]The majority suggests that grievance and interest arbitration both involve a similar grant of power. (At 226 n. 1) It does so without any reasoned discussion. As demonstrated in this opinion, the majority's conclusion in this regard is simply incorrect.

far cry from the Township's conclusion that each and every factual finding made by an arbitrator in *grievance* cases should be subjected to scrutiny for "substantial credible evidence."

Finally, any reliance upon *Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed.*, 78 *N.J.* 144 (1978) is wholly misplaced. That case did not in any way call into question the standard of review to be applied to public employee arbitration. Instead, we held merely that certain decisions—those that were entrusted by law to governmental officials—could not be bargained away by a municipality. Here, however, no managerial prerogatives are involved and hence there is not delegation problem.

This is not to say that public employee bargaining must, in all respects, be viewed as identical to private sector negotiations. As the majority recognizes, our cases establish quite the contrary. Thus, the range of subjects over which public employers and employees may negotiate is more circumscribed than those open to private individuals. *See Board of Ed. of Bernards v. Bernards Tp. Ed. Ass'n,* 79 *N.J.* 311 (1979); *State v. State Supervisory Emp. Ass'n,* 78 *N.J.* 54 (1978); *Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed.,* 78 *N.J.* 144 (1978). And, of course, any arbitral award rendered pursuant to such illegally delegated authority is ineffective. *Ridgefield Park, supra. See School Comm. of W. Springfield v. Korbut,* 369 *N.E.*2d 1148, 373 *Mass.* 788 (Sup.Jud.Ct.1977); *Binghamton Civ. Serv. Forum v. City of Binghamton,* 44 *N.Y.*2d 23, 403 *N.Y.S.*2d 482, 374 *N.E.*2d 380 (Ct.App.1978). Public employee arbitration awards are thus more extensively reviewed for arbitrability than are their private counterparts.

Similarly, even within the sphere of proper bargaining subjects, public employers and employee representatives are subject to greater restraint than is private industry. The relationships between public employers and their employees are, in many respects, closely regulated by both statute and public policy. Negotiated agreements contravening such legislative enact-

ments or contrary to strong public policy are of no force and effect. *State Supervisory Emp. Ass'n, supra.* An arbitral interpretation reaching the same result would likewise be impeachable. *See Bernards Tp. Ed. Ass'n, supra; Wisconsin Emp. Rel. Comm'n v. Teamsters Local No. 563,* 75 *Wis.*2d 602, 250 *N.W.*2d 696 (Sup.Ct.1977). Such restrictions upon private sector bargaining are comparatively rare.

Finally, particular legislative acts may mandate—either expressly or by implication—that an arbitrator consider certain factors in reaching his determination. In such cases we will review the award to the extent necessary to ensure that the arbitrator did in fact take into account those statutorily required considerations. *Cf. City of Atlantic City v. Laezza, supra; Div. 540, supra.*

Nothing in these cases, however, sanctions or even suggests the wide ranging factual scrutiny which the Township would have us apply. Under its approach a judge would, for example, review as to factual accuracy an arbitrator's determination that employee Smith was not ten minutes late on a specified date. I can hardly imagine a procedure which more clearly intrudes upon the arbitrator's role. Such a break from traditional non-interference with the arbitral domain should—if it is to be done at all—be accomplished by direction of the Legislature; it should not be "legislatively" imposed by this Court.

The majority today correctly rejects any such broad standard of judicial review. Instead, it quite properly assesses the award's validity according to the "reasonably debatable" standard. See *ante* at 220–221. We thus reaffirm the traditional approach to the question of arbitral power. Except as noted above, see *supra* at 217–219, public sector arbitration is subject to the same level of judicial scrutiny as is its private counterpart—that is, courts may vacate such an award only where the statutory grounds are met. Although the majority does not

fully explicate its reasoning, it is clear that it recognizes this rule and properly applies it to the facts at hand. I therefore concur.

Justice HANDLER joins in this concurring opinion.

PASHMAN and HANDLER, JJ., concurring in the result.

*For modification* :—Chief Justice HUGHES and Justices MOUNTAIN, JACOBS, PASHMAN, CLIFFORD, SCHREIBER and HANDLER —7.

*Opposed* —None.