709 A.2d 1328

CITY ASSOCIATION OF SUPERVISORS AND ADMINISTRATORS, RESPONDENT, v. STATE OPERATED SCHOOL DISTRICT OF THE CITY OF NEWARK, APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted March 25, 1998—Decided May 8, 1998.

Before Judges KING, MUIR, Jr. and KESTIN.

*Sills Cummis Zuckerman Radin Tischman Epstein & Gross*, attorneys for appellant (*Derlys Maria Gutierrez*, of counsel; *Ms. Gutierrez* and *Monica Dodd Palestis*, on the brief).

*Lindabury, McCormick & Estabrook*, attorneys for respondent (*Anthony P. Sciarrillo*, of counsel; *Mr. Sciarrillo* and *Kathleen M. Connelly*, on the brief).

The opinion of the court was delivered by

KING, P.J.A.D.

## I

The appellant, State–Operated School District of the City of Newark (State District), challenges a decision of the Law Division judge affirming an arbitration award in favor of the City Association of Supervisors and Administrators (CASA). The dispute concerns claimed vacation entitlements under a collective bargaining agreement predating the 1995 takeover of the Newark School

District by the State Department of Education under *N.J.S.A.* 18A:7A–15 and –34. The State takeover occurred because of Newark's failure to provide a thorough and efficient education to its students. We conclude that the arbitrators exceeded their authority in entering this public-sector labor award. We reverse the Law Division order which confirmed the award.

## II

Respondent CASA represents all administrative and supervisory personnel employed by the City of Newark School District which was "taken over" by the State in July 1995. The pertinent collective bargaining agreement contained an internal grievance procedure culminating in binding arbitration for unresolved labor disputes.

On July 19, 1996 the State District notified CASA members of the effects of the administrative reorganization on their employment status respecting termination, demotion or promotion, consequent upon the State takeover. In September 1996 the affected employees received full compensation for vacation days carried over from the July 1, 1995 to June 30, 1996 employment year but only a prorated portion of their vacation days for the July 1, 1996 to June 30, 1997 employment year. The proration recognized vacation-day compensation for those employees who actually worked only a portion of the 1996–97 year.

On October 10, 1996 CASA filed a class action grievance alleging that the State District had unilaterally changed the terms and conditions of members' employment concerning vacation days and reimbursement therefor. The three-member arbitration panel rendered a split decision on November 16, 1996 sustaining the grievance and directing the State District to pay for a full complement of vacation days for employment year 1996–97. CASA applied to the Superior Court for confirmation of the award, which the Law Division judge granted on April 24, 1997.

## III

Article III of the collective bargaining agreement provided that unresolved grievances proceed to final and binding arbitration before a panel of arbitrators. The panel included two members, one each appointed by the opposing parties. The partisan panel members then appointed a third member to serve as chair and neutral arbitrator. This mechanism was appropriate because the "takeover" statute requires that "collective bargaining agreements entered into by the school district shall remain in force," with certain exceptions not here relevant. *N.J.S.A.* 18A:7A–40.[1] Article III, Section C of the collective bargaining agreement also provided that

> [t]he arbitration panel shall be without power or authority to make any decision contrary to, inconsistent with, modify or vary in any way, the terms of this agreement or applicable law or the rules and regulations having the force and effect of statute.

Article XVI of the agreement, entitled "Directors, Assistant Directors, Central Office Supervisors, Curriculum Specialists: Status and Terms of Employment," set forth the disputed vacation entitlements of administrative personnel. Section H provided,

> [d]irectors shall be entitled to twenty (20) days of annual paid vacation to be elected as consecutive working days or other by the personnel involved. Vacations may be taken at any time between July 1 and June 30 *of the following year,* with the approval of the Executive Superintendent.

---

[1] *N.J.S.A.* 18A:7A–40 states:

> a. When the board of education is removed and a State-operated district is established, pursuant to section 1 of this amendatory and supplementary act, or when local control is reestablished, pursuant to section 16 of this amendatory and supplementary act, *collective bargaining agreements entered into by the school district shall remain in force,* except where otherwise expressly provided in this amendatory and supplementary act.
>
> b. Except where otherwise expressly provided in this amendatory and supplementary act, all teaching staff members and other employees of a State-operated district shall retain and continue to acquire all rights and privileges acquired pursuant to Title 18A of the New Jersey Statutes. After the reestablishment of local control in the district, the board shall preserve and recognize all rights and privileges acquired prior to and during the State operation of the district. (Emphasis supplied).

[Emphasis supplied.]

Curriculum specialists received the same vacation time as the agreement provided to directors. The agreement also gave central office supervisors "vacation days consistent with contract language which applies to all other 12 month CASA unit members." Twelve-month employees work from July 1 to June 30 of each year; ten-month employees work from September through June and do not receive the same vacation entitlement as twelve-month employees. (We have the impression that ten-month employees do not receive any vacation days because of their reduced work schedule and summer recess but can not verify this from the record.)

The July 19, 1996 notice advised these employees that they would receive compensation for their unused vacation days. In September 1996 the State District paid the impacted employees for all vacation days carried-over from the 1995–96 employment year. The State District then prorated and paid for their vacation days for the 1996–97 employment year, from July 1 to September 20, 1996.

A number of twelve-month employees filed individual grievances concerning the proration of their vacation days for the 1996–97 school year. When these disputes could not be resolved, CASA filed the class-action grievance on October 10, 1996, demanding arbitration pursuant to Article III of the agreement. CASA argued the State District owed its twelve-month employees the full vacation allotment for the 1996–97 employment year as of July 1, 1996, the beginning of the employment year. CASA claimed:

> For the last 15–20 years, CASA members received their annual allotment of vacation days on the first day of the contract year [July 1] and had the right to use them immediately. On or about September 20, 1996 CASA members who were to receive compensation for accumulated vacation days were advised that days were earned during the year and were compensated on a pro-rata basis.
>
> This constitutes a change in the terms and conditions of employment and represents a unilateral diminution in a contractual right, *i.e.,* compensation for accumulated vacation days as set forth in the District/CASA contract and past practice.

CASA demanded the State District compensate the affected individuals in accordance with the long-standing practice.

CASA and the State District defined the sole issue to be decided by the arbitration panel:

> Did the Newark State–Operated District violate the vacation provisions of the collective bargaining agreement? If so, what shall be the remedy?

The State District maintained the agreement clearly and unambiguously stated that vacation entitlement for a given employment year is earned in the prior employment year. The State District did not present any witnesses or evidence to support its position but relied on the text of Article XVI which states the vacation days could be taken any time between July 1 and June 30 "of the following year." The State District emphasized that generous or indulgent past practice could not alter the clear text of the agreement.

CASA argued that for the past twenty-five years, both parties consistently had interpreted and applied Article XVI to give twelve-month employees their full allotment of vacation days on or as of July 1, the beginning of the employment year. To establish these past practices, CASA presented testimony at the hearing from nine witnesses. These witnesses testified they could use all of their vacation days immediately after July 1, without proration. The witnesses also said that employees who stopped working for the Newark School District before the end of the employment year received the entire balance of their twenty-day vacation entitlement.

Leonard Puglaise, vice-president of CASA and a twenty-seven year district employee, testified that in his experience, the entire vacation allotment could be taken as of July 1 and "proration was never used to allocate days for partial years of employment." Puglaise personally had been involved in handling grievances. He recalled Grace Walls, an employee who took a terminal sabbatical leave on February 1, 1996 and retired on June 30, 1996. She filed a grievance claiming her full twenty-days vacation. Puglaise testified the grievance was resolved by paying Walls for twenty

days, the full vacation allotment for 1995–96, without any proration reflecting actual service.

The employment status of Reginald Tate, Frank Russomanno, and Janet Goldstein changed after the reorganization. All three employees testified they expected to be paid for twenty days of vacation in 1996–97 because their vacations had never been prorated in the past. During his first year as a twelve-month employee, Tate testified he took his vacation during late July and early August. Goldstein provided check stubs from 1990 to show she received the full vacation allotment from day one of each year and said she sometimes used them "right away."

Ruth K. Assarsson, who became a twelve-month employee in 1970, testified that before her retirement in 1988, she could use her vacation days at anytime throughout the current, rather than the "following year." Likewise, Robert G. Clark, who retired from a twelve-month position in June 1992, believed his pay stubs illustrated the Newark School District's practice of permitting employees to use their twenty vacation days anytime after July 1 of the current year.

The arbitration panel concluded that the State District "violated a mutually-agreed-upon amendment of the agreement concerning vacation entitlements." The panel did acknowledge that the language in Article XVI was "not susceptible to any plausible alternative interpretation" and meant "vacation entitlement for a given year is earned in the prior year." However, the panel concluded that the Newark School District's "past practices" had amended the clear language of the agreement. The panel ordered payment, within 30 days, for the twenty vacation days for the 1996–97 employment year without proration for time actually worked. As noted, the Law Division judge agreed.

## IV

We agree with the State District's contention that the "arbitrators exceeded ... their powers" within the meaning of

*N.J.S.A.* 2A:24–8(d) [2] by ignoring the language of the agreement and relying solely on past practices to award unearned vacation benefits to CASA's members. The State District's proration of benefits fairly recognized the accrued and fully-earned rights of CASA members who were terminated, reassigned or demoted, consistent with the "following year" language of Article XVI, Section H. The past administrative practice, no doubt convenient and congenial for both the CASA members and the ousted Newark School District, to permit taking vacations during the employment year contemporaneous with their accrual, was followed routinely. This did not justify granting unearned benefits when terminations or demotions were necessary to implement the State takeover.

We recognize that arbitration is viewed favorably by our courts as a desirable method of settling disputes between labor and management without resort to judicial intervention. *Local No. 153 v. Trust Co. of New Jersey,* 105 *N.J.* 442, 447, 522 *A.*2d 992 (1987); *County College of Morris Staff Ass'n v. County College of Morris,* 100 *N.J.* 383, 390, 495 *A.*2d 865 (1985). "It is quick and efficient, and minimizes disruption in the workplace." *Local 153,* 105 *N.J.* at 448, 522 *A.*2d 992. Thus, the role of our courts in reviewing arbitration awards is ordinarily quite limited.

Arbitration in the context of public labor disputes differs somewhat from arbitration under private-sector contracts. *Tretina Printing, Inc. v. Fitzpatrick & Assoc., Inc.,* 135 *N.J.* 349, 362, 640 *A.*2d 788 (1994). In *Tretina,* the Supreme Court recognized that parties who voluntarily enter into commercial contracts with arbitration clauses are not compelled by circumstances or law to deal with each other; they voluntarily use arbitration as a last resort to

---

[2] *N.J.S.A.* 2A:24–8(d) states:

The court shall vacate the award in any of the following cases:

\* \* \* \* \* \* \* \*

d. Where the arbitrators exceeded or so imperfectly executed their powers that a mutual, final and definite award upon the subject matter submitted was not made.

settle disputes informally. 135 *N.J.* at 362–63, 640 *A.*2d 788. However, in a public labor agreement context, the parties must deal with each other. "In that circumstance the agreement to arbitrate is vital to keeping the relationship between the parties afloat and guided by a set of agreed-to rules." *Id.* at 362, 640 *A.*2d 788.

■ The Supreme Court in *Tretina* adopted a very deferential standard for sustaining private-sector arbitration awards in the commercial setting, where arbitration is completely voluntary. In commercial settings, an arbitration award can be vacated "only for fraud, corruption, or similar wrongdoing on the part of the arbitrators [*N.J.S.A.* 2A:24–8(a) ]" and can be corrected for the reasons set forth in *N.J.S.A.* 2A:24–9. *Id.* at 358, 640 *A.*2d 788. Indeed, a court may no longer vacate a decision rendered in private-sector arbitration because of a mistaken interpretation of the law. *Id.*

■ However, the Supreme Court in *Tretina* recognized an exception to the strict rule of judicial non-intervention in cases involving public employment. *Id.* at 364, 640 *A.*2d 788. Specifically, the Court noted that in a public-sector labor arbitration setting, "a court can properly vacate an award because of a mistake of law." *Id.; Communications Workers of America, Local 1087 v. Monmouth County Bd. of Social Servs.*, 96 *N.J.* 442, 453, 476 *A.*2d 777 (1984). The Court deemed this exception necessary because "public policy demands that a public-sector arbitrator, who must consider the effect of a decision on the public interest and welfare, issue a decision in accordance with the law." *Tretina*, 135 *N.J.* at 365, 640 *A.*2d 788; *see Kearny PBA Local # 21 v. Town of Kearny,* 81 *N.J.* 208, 217, 405 *A.*2d 393 (1979). Thus, public employee arbitration awards are reviewed more extensively than their private counterparts. *Id.* at 230, 405 *A.*2d 393. In the public sector, "public policy demands that inherent in the arbitrator's guidelines are the public interest, welfare and other pertinent statutory criteria." *Id.* at 217, 405 *A.*2d 393.

■ The core issue here involves the scope of the arbitration panel's authority. The question is whether the panel exceeded its authority by finding that past practices of the now-displaced Newark School District amended the clear language of the collective bargaining agreement. The agreement allowed CASA to submit an unresolved grievance to arbitration. Article III of the agreement defined a grievance as:

> any dispute or controversy between the Board or its representatives concerning the interpretation, application, or enforcement of the provisions of this agreement, including this article, or the rules, regulations, or orders of the Board or those of the State Board of Education, or any other dispute concerning the terms of employment or allegation of bias or vindictive action against the personnel.

Here, the grievance qualified for arbitration because vacation entitlements for twelve-month employees in administrative positions are a term and condition of employment. However, the scope of an arbitrator's authority is limited by the collective bargaining agreement and by statute, *N.J.S.A.* 2A:24–8. *Local 153*, 105 *N.J.* at 449, 522 *A.*2d 992; *Communications Workers*, 96 *N.J.* at 448, 476 *A.*2d 777.

The authority of an arbitrator to resolve a dispute depends upon the agreement between the parties. *Ridgefield Park Educ. Ass'n v. Ridgefield Park Bd. of Educ.*, 78 *N.J.* 144, 393 *A.*2d 278 (1978). An agreement can set limits on the powers delegated to the arbitrator. *State Dep't of Law and Public Safety v. State Troopers Fraternal Ass'n*, 91 *N.J.* 464, 473, 453 *A.*2d 176 (1982) ("In all matters, the arbitrator is limited to the authority vested in him by the parties.") (Schreiber, J., dissenting). "These restrictions relate both to the procedure that the arbitrator must apply in resolving disputes and the substantive matters that he may address." *Communications Workers*, 96 *N.J.* at 448, 476 *A.*2d 777. If an arbitrator exceeds the scope of that authority, then his decision may be vacated on statutory grounds pursuant to *N.J.S.A.* 2A:24–8.

The State District asserts the arbitration panel violated the scope of its duties as defined in the collective bargaining agree-

ment. Article III of the agreement defines the panel's responsibilities as follows:

> [i]t shall, in the performance of its duties, be bound by and comply with the provisions of this agreement. It shall have no power to add to, delete from, or modify in any way, any of the provisions of this agreement.

Moreover, Article III states the panel "shall be without power or authority to make any decision contrary to, inconsistent with, modify or vary in any way, the terms of this agreement or applicable law or the rules and regulations having the force and effect of statute." These restrictive clauses impose limits on the panel's authority.

To explicate how twelve-month employees earned vacation days, the agreement provided: "[v]acations may be taken at any time between July 1 and June 30 of the following year." This provision was clear and unambiguous. In its opinion and award, the arbitration panel acknowledged this language "is not susceptible to any plausible alternative interpretation ... the agreement is very clear that the vacation entitlement for a given year is earned in the prior year."

Nonetheless, the panel concluded that past practices of the parties demonstrated they intended to amend the agreement's clear language. To establish past practice, the panel looked at "clarity and consistency, longevity and repetition, and mutuality." The panel relied on the testimony of CASA witnesses. Specifically, these witnesses established that over the past thirty years, "the parties defined the meaning of the agreement language 'of the following year' as meaning that 12–month employees were entitled to the full vacation allotment from day one of the year, without proration for partial year service."

The panel recognized, however, that past practice cannot unilaterally change a written contract. Rather, both parties must mutually agree to modify its terms. To establish mutuality, the panel observed that vacations must be taken "with the approval of the Executive Superintendent." Even if the executive superinten-

dent did not actually approve the vacation requests of all members of the administrative staff, the panel was convinced that,

> since the grievants were administrators on the central office staff whose vacation requests according to the uncontroverted testimony of CASA witnesses were approved by senior administrators in the central office, the practice was well known among senior administrators and therefore mutually agreed to by the parties. There was no evidence to the contrary.

Thus, the panel concluded past practice between the parties actually and mutually amended and overruled the clear language of the agreement.

While *N.J.S.A.* 2A:24–1 to –11 grants public-sector arbitrators "extremely broad powers," these powers are subject to some limited judicial review. *Barcon Assoc., Inc. v. Tri–County Asphalt Corp.*, 86 *N.J.* 179, 187–88, 430 *A.*2d 214 (1981). Specifically, *N.J.S.A.* 2A:24–8 describes situations where a court must decline to enforce an arbitration award. The statute provides in pertinent part:

> The court shall vacate the award in any of the following cases:

> \* \* \* \*

> (d) Where the arbitrators exceeded or so imperfectly executed their powers that a mutual, final and definite award upon the subject matter submitted was not made.
> [*N.J.S.A.* 2A:24–8(d).]

The arbitration panel exceeded its authority by ignoring the clear and unambiguous language of the agreement concerning the manner in which vacation days were earned. First, the panel added to the agreement the concept of past practices. However, the agreement does not give the arbitrators the power to make any decision "contrary to, inconsistent with, modify or vary in any way, the terms of this agreement." Second, the panel ignored the clear language of the agreement and reached a different result than that bargained for by the parties. The panel violated its responsibilities to "be bound by and comply with the provisions of this agreement." The agreement clearly circumscribed the panel's substantive authority to change the terms of the vacation provision.

CASA argues the award, even if deemed contrary to the clear language of the vacation provision, still must be given credence because it "draws its essence" from the agreement. CASA relies on *International Bhd. of Elec. Workers, Local Union No. 199 v. United Tel. Co. of Florida*, 738 *F*.2d 1564 (11th Cir.1984), where the Circuit Court held that an arbitrator's award may be considered valid, even if it appears contrary to the express terms of the agreement, "if it is premised upon reliable evidence of the parties' intent." *Id.* at 1568. However, in that case, the court agreed with the arbitrator that language in the collective bargaining agreement was ambiguous. The court there held the arbitrator could interpret the ambiguity based upon a combination of past practice, industrial efficiency, and bargaining history. The federal authority is not persuasive. There is no ambiguity on the face of this agreement about vacation entitlements. The record contains no evidence to support an argument that compensating unearned vacation time was consistent with either industrial efficiency or the collective bargaining history. Instead, the past practice actually conflicts with the public interest and sound public policy.

 In addition to resolving a dispute according to the negotiated agreement, an arbitrator in a public employment case must consider the law and the public interest. *Communications Workers*, 96 *N.J.* at 453, 476 *A.*2d 777. In this case, the Board of Education of the City of Newark and CASA were the original parties to the pertinent collective bargaining agreement. However, on July 12, 1995, the State Department of Education, through administrative takeover, created the State-operated school district of Newark. *Board of Educ. of Newark v. New Jersey Dep't of Treasury*, 145 *N.J.* 269, 271 n. 1, 678 *A.*2d 660 (1996). The Newark Board of Education ceased to exist. *Id.* The State directed the removal of the local school authorities for failing to provide its students with a thorough and efficient system of education. *N.J.S.A.* 18A:7A–15, –34; *see Abbott v. Burke*, 149 *N.J.* 145, 192, 693 *A.*2d 417 (1997). The State-operated district

vigorously contends that it is not bound by inefficient administrative practices of the Newark School District. We agree.

The Public School Education Act of 1975(Act), *N.J.S.A.* 18A:7A–1 to –52, requires a newly-installed State district superintendent to prepare a reorganization of the district's central administrative and supervisory staff within one year of the takeover. *N.J.S.A.* 18A:7A–44(b).[3] The Act also provides in pertinent part, "the positions of the central administrative and supervisory staff, instructional and noninstructional ... shall be abolished upon the reorganization of the State-operated school district's staff.... Employees or officers not hired for the reorganized staff shall be given 60 days' notice of termination or 60 days' pay." *N.J.S.A.* 18A:7A–44(c).[4] Moreover, the statute authorizes the State district

---

[3] *N.J.S.A.* 18A:7A–44(b) states:

Within one year of the establishment of the State-operated school district, the State district superintendent shall prepare a reorganization of the district's central administrative and supervisory staff and shall evaluate all individuals employed in central administrative and supervisory staff positions. The State district superintendent shall implement the reorganization on the July 1 next following its preparation, unless otherwise directed by the commissioner.

[4] *N.J.S.A.* 18A:7A–44(c) states:

Notwithstanding any other provision of law or contract, the positions of the central administrative and supervisory staff, instructional and noninstructional, other than those positions abolished pursuant to subsection a. of this section, shall be abolished upon the reorganization of the State-operated school district's staff. The State district superintendent may hire an individual whose position is so abolished, based upon the evaluation of the individual and the staffing needs of the reorganized district staff. These individuals shall be hired with tenure if they had tenure in their prior position. If they did not have tenure in their prior position, they may obtain tenure pursuant to the provisions of *N.J.S.* 18A:28–6. Individuals hired as State assistant superintendents shall not be hired with tenure and shall not acquire tenure. Employees or officers not hired for the reorganized staff shall be given 60 days' notice of termination or 60 days' pay. The notice or payment shall be in lieu of any other claim or recourse against the employing board or the school district based on law or contract. Notwithstanding this limitation, nothing herein shall preclude an individual from asserting upon separation from service any legal contractual right to health care

superintendent to "make, amend and repeal district rules, policies and guidelines, not inconsistent with law for the proper conduct, maintenance and supervision of the schools in the district." *N.J.S.A.* 18A:7A–35(f).[5]

The State District properly contends, and we agree, that the Act grants State-operated school districts strong powers to modify and amend the practices of previously ineffective or failed local school administrations. This interpretation is wholly consistent with the Act's legislative findings and declarations. *N.J.S.A.* 18A:7A–2. The Legislature accepted responsibility for monitoring and sometimes taking over the system of local public schools and providing corrective action when necessary to ensure adequate progress toward the achievement of constitutionally-mandated educational goals and objectives. Just as the Legislature gave State-operated school districts the power to abolish unnecessary or inefficient central administrative staff, the lawmakers also intended for State-operated school districts to eliminate their inefficient economic practices.

CASA also argues the Act does not give the State-operated district authority to abrogate an existing collective bargaining agreement, including incorporated past practices. *N.J.S.A.* 18A:7A–40 in pertinent part does provide:

> When the board of education is removed and a State-operated district is established, pursuant to section 1 of this amendatory and supplementary act, or when local control is reestablished, pursuant to section 16 of this amendatory and

---

coverage, annuities, accrued vacation days, accrued sick leave, insurance and approved tuition costs. Any employee whose position is abolished by operation of this subsection shall be entitled to assert a claim to any position or to placement upon a preferred eligibility list for any position to which the employee may be entitled by virtue of tenure or seniority within the district. No employee whose position is abolished by operation of this subsection shall retain any right to tenure or seniority in the positions abolished herein.

[5] *N.J.S.A.* 18A:7A–35(f) states:

(f) The State district superintendent may make, amend and repeal district rules, policies and guidelines, not inconsistent with law for the proper conduct, maintenance and supervision of the schools in the district.

supplementary act, **collective bargaining agreements entered into by the school district shall remain in force,** except where otherwise expressly provided in this amendatory and supplementary act.

[*N.J.S.A.* 18A:7A–40(a), emphasis added.]

CASA's argument does not persuade us. The State District does not propose to modify the existing agreement. Rather, the State District is asking this court to enforce the clear and unambiguous language of Article XVI which states: "[v]acations may be taken at anytime between July 1 and June 30 of the following year." Even the arbitration panel acknowledged there were no alternative explanations for this provision because it clearly meant that twelve-month administrative employees earned their vacation time in the prior year.

The State District's plan to prorate vacation time compensation for employees whose status changed because of the takeover is manifestly consistent with sound public policy. Clearly, the purpose of the State takeover was to make the local school district more efficient and responsive to educational and economic reform. To require the State-operated district to continue an inefficient, costly administrative practice, not explicitly bargained for by the parties or sanctioned by the agreement, undermines the Act's goal to provide students with a "thorough and efficient" education. In this case, employees who were terminated or demoted to ten-month positions did receive sixty-days notice or sixty-days pay in lieu of advance notice, pursuant to *N.J.S.A.* 18A:7A–44(c). The State District did not require these employees to use their vacation time before they could collect the sixty-days pay. Also, the employees who testified before the arbitration panel agreed their status changed as of the July 19, 1996 notice. To give these employees the full twenty days of vacation, after they had worked only a few weeks of the new employment year, would require the State-operated school district to continue those very kinds of practices of the local district that likely contributed to the need for the takeover, thus continuing needlessly to drain money essential for educational purposes.

Finally, we also reject CASA's reliance on Department of Personnel regulations, *N.J.A.C.* 4A:6–1.2(a).[6] This State regulation does not relate to school district employees and contemplates the "anticipation of continued employment."

The judgment of the Law Division confirming the award is vacated.

---

[6] *N.J.A.C.* 4A:6–1.2(a) states in pertinent part:

Full-time State employees in the career service shall be entitled to annual paid vacation leave, credited at the beginning of each calendar year in anticipation of continued employment, based on their years of continuous State full-time or part-time service in the career, senior executive or unclassified service.