**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0015-21

NEWARK FIRE OFFICERS UNION,
LOCAL 1860, IAFF, AFL-CIO,

    Plaintiff-Respondent,

v.

CITY OF NEWARK, a municipal
corporation of the STATE OF NEW
JERSEY,

    Defendant-Appellant.

_____

Argued November 16, 2022 – Decided December 3, 2024

Before Judges Accurso and Vernoia.

On appeal from the Superior Court of New Jersey,
Chancery Division, Essex County, Docket No.
C-000066-21.

Sean P. Joyce argued the cause for appellant
(Carmagnola & Ritardi, LLC, attorneys; Sean P.
Joyce, of counsel and on the briefs; Stephanie Torres,
on the briefs).

Paul L. Kleinbaum argued the cause for respondent
(Zazzali, Fagella, Nowack, Kleinbaum & Friedman,

attorneys; Paul L. Kleinbaum, of counsel and on the
brief; Craig A. Long, on the brief).

The opinion of the court was delivered by

ACCURSO, P.J.A.D.

Plaintiff Newark Fire Officers Union, Local 1860, IAFF, AFL-CIO and defendant City of Newark are parties to a 2013 collective negotiations agreement providing two "terminal leave" options for retiring officers: the "traditional" option allows an officer to remain on the payroll at full salary, earning pension credits but not reporting to work during a terminal "compensation leave period" or CLP; and the "lump sum" option, which the parties negotiated in 1987, defined in CNA § 9.09 as "a lump sum payment of one hundred percent (100%) of the total cost that the City would have incurred had the retiree remained <u>on the payroll under the current procedure in lieu of terminal leave</u> as provided in 9.04. Four (4) for one (1)."[1]

---

[1] Arbitrator Licata explained the compensatory leave period under the CNA is calculated pursuant to a formula based on accumulated compensatory time due for holidays for the period spanning July 1, 1965 to December 31, 1970, accrued compensatory time in the amount of three calendar days for each year of service, deferred vacation, accrued vacation consisting of a maximum 48 hours or two 24-hour days, and a maximum of three personal days per year. "[A] multiplier(s) is applied to each form of accrued leave and then hourly rates comprised of base salary, longevity, holiday pay, clothing allowance, hazardous duty pay and tour commander differential, if applicable are

A-0015-21

The question the parties submitted to grievance arbitration was whether the City had violated § 9.09 of the CNA by failing to include vacation and personal days that were scheduled to accrue only after the officer had retired in its calculation of the lump sum terminal leave option. Arbitrator Licata, although conceding the City had not included vacation and personal days that would accrue during a period of terminal leave in its calculation of the CLP under either terminal leave option when the provision was newly negotiated — nevertheless determined the language of the contract was clear and unambiguous, and the phrase "under the current procedure" could not refer to the way the City calculated the CLP at that time, but could only "be construed as referring to the procedure by which the retiree elects the lump-sum option as opposed to a substantive benefit which contradicts the substantive benefit unambiguously established by the language which immediately follows."

The trial court confirmed the award, finding the arbitrator was free to disregard the way the City calculated the CLP when the provision was

---

multiplied by the total days of accrued leave" to arrive at the "total cost of the CLP for the traditional terminal leave benefit."

§ 9.04 of the CNA provides: "Any employee covered by this Agreement shall earn three (3) calendar days for each year of service which will be accrued as compensatory time leave to be granted upon age and service retirement."

negotiated — and for the thirty years that followed — because the arbitrator's finding that the critical "language [is] 'clear and unambiguous' . . . is 'reasonably debatable.'" We disagree and reverse.

This grievance arose in a somewhat unusual way. In August 2010, Gary Palmerson, a firefighter in the Newark Firefighters Union, Inc., a different bargaining unit with a different contract, advised he planned to retire on December 1, and elected to take the lump sum option for his terminal leave. The Chief Clerk calculated his CLP as she had been trained to do twenty-five years before — the way it had always been done for firefighters under either terminal leave option — resulting in a CLP of 261 calendar days, extending from December 1, Palmerson's actual pension retirement date, to August 18, 2011.

Palmerson, having read Article XLIV § 1 of the union contract that "an employee may elect the option of receiving wages and other benefits due them in a lump sum <u>equal to the cost to the City for such wages and other benefits had the employee remained on the payroll to receive same</u>," objected to the calculation. He, and eventually his union, claimed the language meant that firefighters continue to earn vacation and personal days during their compensation leave period under both terminal leave options, although they

A-0015-21

were not reporting to work, and "that those earned days should be included to extend that period." Palmerson claimed he was owed another 8 days for vacation and 3 personal days he would have earned during his compensation leave period after his December 1, 2010 retirement date, thereby extending that period from August 18, 2011 to September 11, 2011, resulting in the City owing "him a payment for 16 more calendar days.[2] The Chief Clerk explained

---

[2] Arbitrator Zudick who presided over the 2015 Newark Firefighters arbitration explained the calculation of vacation and personal days in his opinion and award as follows:

> Firefighters earn a maximum of 10 vacation days per year. Since it takes a full year to earn the 10 days those days are generally used in the following calendar year. Thus, the vacation time earned, for example, in 2009 is available for use in 2010. Since firefighters work a 24-hour day and receive 10 vacation days per year, each of their vacation days is actually worth more than the normal vacation day for a non-firefighter. To account for the difference on the Form [used to calculate the CLP], the number of vacation days a firefighter has available in any calendar year is at first doubled so that if all 10 days are available the Form will show 20 days. In converting that number to calendar days the parties have agreed to multiply by 2. Thus, a firefighter with all 10 days available for use in a calendar year will he reflected on the Form as 20 x 2 = 40 calendar days. Personal days are handled differently. Firefighters receive 3 personal days per year. Since the resolution of a grievance concerning personal days in 2011 . . .

5

"that whether a firefighter chose the terminal leave or lump sum method to receive their benefit payment, once they were no longer coming to work, they no longer earned vacation time or personal days." The City maintained the union was improperly arguing for firefighters to receive vacation time and personal days "of up to two years . . . after their effective date of retirement."

Arbitrator Zudick sided with the union. Notwithstanding the City had calculated the CLP for Palmerson in the same way it had always calculated it for all retirees in the bargaining unit regardless of which terminal leave option they'd chosen, and that there had never been a grievance filed over the method of calculation in thirty years, Zudick rejected the City's reliance on that past practice, finding the language of the contract "clear and unambiguous."

---

the parties agree that employees receive all 3 personal days on January 1 of each year and all those days are available to be used even if a firefighter leaves the Department before the end of the year. The number of personal days a firefighter has available in a given calendar year are simply multiplied by 2 to determine the number of calendar days on the Form. Thus, the 3 personal days a firefighter receives in a year equals 6 calendar days on the Form.

The exhibits to the 2015 opinion and award were not included in the parties' appendices, leaving us unable to explain Palmerson's calculation.

6

Zudick reasoned that because employees exercising terminal leave remain on the payroll as active employees earning pension credits and continuing to receive their regular paycheck every two weeks, "there should be no dispute that they continue to earn both vacation time and personal days during the period their terminal leave time is being used" even though they are no longer reporting to work. "Having concluded that employees electing the terminal leave benefit continue to accrue vacation and personal days until their effective retirement date," Zudick determined "the parties' intent" in stating that firefighters electing the alternative option were entitled to "a lump sum equal to the cost to the City for such wages and other benefits had the employee remained on the payroll to receive same" was a "clear and unambiguous" statement that "the City agreed to calculate the compensation leave period for employees electing the lump sum option the same as it calculated the terminal leave benefit."

Zudick concluded that "[t]o the extent the City has calculated the terminal leave and lump sum options without including vacation and personal days earned during the terminal leave period it has varied from the clear terms of the Agreement," and that thirty years of "[i]nconsistent practice does not supersede clear contract terms." He ordered the City, effective immediately,

7

that is, as of June 4, 2015, to "calculate the terminal leave of all future retirees [who are in the collective negotiations unit of the firefighters' union] whether they choose the terminal leave benefit or the lump sum terminal leave option — by including vacation and personal days earned during the compensation leave period."

In September 2016, fifteen months after the Zudick award, the Union filed the grievance in this matter alleging the City violated § 9.09 when it failed to calculate Captain Kevin Mitchko's lump sum benefit in accord with the award in the Zudick arbitration. The Union contended the language of § 9.09 was "virtually identical" to that of Article XLIV of the firefighters' agreement and demanded the City use the same method for calculating the compensation leave periods for the fire officers, including Captain Mitchko, retroactive to December 1, 2010 the date Firefighter Palmerson retired.

The language of Article XLIV of the firefighters' contract and § 9.09 in the CNA at issue here, although addressing the same topic, is obviously different.

Article XLIV, section 1 of the firefighters' agreement provides:

> Upon separation from the City, an employee may elect the option of receiving wages and other benefits due them in a lump sum equal to the cost to the City for such

8

wages and other benefits <u>had the employee remained on the payroll to receive same</u>.

§ 9.09 states:

Upon separation for any reason, an employee may elect a lump sum payment of one hundred percent (100%) of the total cost that the City would have incurred <u>had the retiree remained on the payroll under the current procedure</u> in lieu of terminal leave as provided in 9.04.  Four (4) for one (1).[3]

After quoting pages of the Zudick award verbatim, Licata began his analysis by noting that "[u]ltimately, the fidelity of any arbitrator is to divine the intent of the parties who negotiated the contract before him."  He explained that

[a]lthough arbitrators may differ in determining whether language is clear or ambiguous, the determination should account for certain truisms.  For example, it is true that parties who draft provisions of a labor agreement are not always literary scholars

---

[3]  Neither the parties nor the arbitrator addressed the meaning of this last sentence.  We surmise it may relate to the CLP calculation for vacation days explained by Arbitrator Zudick:

the number of vacation days a firefighter has available in any calendar year is at first doubled so that if all 10 days are available the Form will show 20 days. In converting that number to calendar days the parties have agreed to multiply by 2.  Thus, a firefighter with all 10 days available for use in a calendar year will he reflected on the Form as 20 x 2 = 40 calendar days.

9

blessed with an infallible command over the English language.

Licata found, however, that

> even where contract language has been adequately drafted, as in this matter, a practice may develop which is inconsistent with the intent of the negotiators. Sometimes an implementing practice deviates from the intent of the drafters due to a misunderstanding of what was actually negotiated by those charged with implementing the benefit, especially benefits necessitating accounting and payroll procedures. And, once such an error is made by accounting and/or payroll personnel, it may be passed along to their successors and may continue undetected for many years, as in this case. Therefore, in my opinion, every reasonable effort should be made to first determine the intent of the parties based on the language which they used and the relevant context in which that language appears.

Licata found "no ambiguity in the predominant message conveyed by the language chosen, that is, a lump-sum terminal leave retiree is entitled to payment in the amount of 100% of the cost of the traditional terminal leave benefit." And, although the arbitrator began his analysis with the importance of divining the intent of the drafters, he ultimately concluded "that even if the parties who originally negotiated the benefit into the 1987-1988 Agreement" didn't agree on how retirees would be credited for vacation and personal days accruing during a compensation leave period, it didn't follow "that the

A-0015-21

grievance must be denied because the parties who originally negotiated the benefit did not foresee the Union's interpretation of Article 9.09" in 2015.

The City argued "the words 'under the current procedure' are not merely surplus words that have no meaning," but have instead "guided the expectation of both parties" as to the calculation of the CLP, which all agree the City performed in exactly the same manner for retirees choosing traditional terminal leave or the lump sum option "by not crediting the accrual of vacation and personal days, <u>regardless of which terminal leave option was elected</u>" (emphasis is the arbitrator's). The arbitrator dismissed the City's insistence that the critical language referred unmistakably to the then "current procedure" of calculating the CLP for retirees taking terminal leave. He found "the language 'under the current procedure,' which connects with (and follows) 'had the retiree remained on the payroll' merely completes the thought of defining the traditional terminal leave procedure as the 'current procedure,'" and "more likely than not, referred to the traditional terminal leave procedure, i.e., remaining on the payroll until retirement by virtue of accruing three calendar days of compensatory time for each year of service" under § 9.04.[4]

---

[4] § 9.04 is not the only section of the contract addressing traditional terminal leave. § 9.07 requires fire officers to provide sixty days written notice prior to

Licata found that to find ambiguity in the words "under the current procedure," would require the phrase to be "catapult[ed] 21 words above its proper placement within the article, i.e., to include it after the phrase, 'elect a lump sum payment,'" as in "[u]pon separation for any reason, an employee may elect a lump sum payment under the current procedure of one hundred percent (100%) of the total cost that the City would have incurred [ ] had the retiree remained on the payroll in lieu of terminal leave as provided in 9.04." He concluded "such a gross misplacement of the verbiage the parties selected to express their intent cannot be sanctioned," repeating that "when construed in its proper context, the 'under the current procedure' language refers, not to the lump-sum option, but to the traditional terminal leave procedure which, in turn, serves as the equalizing benchmark for the calculation of the lump-sum retiree's CLP."

Continuing to address an argument the City did not make, that is, moving the clause to someplace else in the provision, the arbitrator found that

the date they request their "pre-retirement leave to begin"; § 9.08 provides two vacation days each year "may be used or accrued for terminal leave or lump sum"; and § 7.04 states that "accumulated compensatory time due for holidays for the period 7/1/65 to 12/31/70 pursuant to Executive Orders #236 and #241 . . . not . . . taken during the period of employment shall be granted as compensatory time leave upon age and service retirement and special retirement."

even were he "to improperly rewrite" § 9.09 as "implicitly suggested" by the City, "the 'current procedure' language . . . most likely refers to how the retiree goes about making an election, that is, who he or she contacts, what forms are filled out, etc., as opposed to establishing a substantive benefit." The arbitrator concluded that at the time § 9.09 was negotiated, "'the language 'under the current procedure' could not have been incorporated to signify a distinction between the lump-sum CLP and the traditional terminal leave CLP calculations" — another argument the City did not make here — and thus rejected the phrase as a reason "to look beyond the plain language which was negotiated by the parties."

Licata disagreed with the City that the "under the current procedure language" distinguished § 9.09 from Article XLIV, section 1 of the firefighters' contract, "requiring a disregard of the Zudick award." Instead, he found the language "a distinction without a difference when it comes to the application of the Zudick award to this matter." Thus, Licata accepted the City's position that "officers who choose the lump-sum option simply do so 'in lieu of terminal leave,'" and "are to be compensated for accrued time equally to those who retire under the terminal leave option, that is, to receive 'payment of

13

one hundred percent (100%) of the total cost that the City <u>would have incurred had the retiree remained on the payroll</u> under the current procedure <u>in lieu of terminal leave</u>[,] — i.e., the lump sum option" (emphasis is the arbitrator's). He accepted the Union's argument that the "under the current procedure" language "in no way, shape or form means the past practice by which the City failed to properly calculate the CLP for those retirees electing the lump-sum."

Finally, Licata noted that "arbitrators must avoid an interpretation of a contractual provision which leads to absurd or nonsensical results, citing Elkouri & Elkouri, <u>How Arbitration Works</u> 9-43 (8th ed. 2018). He found that to allow "the current procedure" language to distinguish the firefighters' contract from this CNA after the Zudick award, "yields the realistic potential that a promotion near the end of a firefighter's career will actually result in a decreased benefit at the time of retirement." Thus, not having been presented with a reason "why the two fire unions would have negotiated such a differentiated retirement benefit, it must be concluded that the City's interpretive position in this matter is not sustainable."

Licata concluded the City had violated § 9.09 of the CNA "by failing to calculate the CLP for lump-sum terminal leave retirees, as if they had remained on the payroll (or, stated differently, as if they elected the traditional

terminal leave option), thereby entitling them to pre-retirement CLP credit for the accrual of vacation and personal days."  Acknowledging the fiscal impact of the award sought by the Union, which would have required the City to use the same method for calculating the compensation leave periods ordered in the Zudick arbitration — recalculation of the terminal leave of all retirees whether they chose the terminal leave benefit or the lump sum terminal leave option — for the fire officers retroactive to December 1, 2010, the arbitrator directed the City to recalculate the CLP for all lump-sum terminal leave retirees who retired on or after October 1, 2016, the date of Captain Mitchko's retirement. See S. Plainfield Bd. of Educ. v. S. Plainfield Educ. Ass'n ex rel. Eng., 320 N.J. Super. 281, 295 (App. Div. 1999) (holding the fiscal impact of a grievance arbitration award "is an entirely appropriate consideration when constructing an appropriate remedy for a breach of contract").

As noted, the trial judge confirmed the arbitration award, concluding the arbitrator's finding that the language "under the current procedure" in § 9.09 was "'clear and unambiguous' . . . is 'reasonably debatable.'"  The court found that for the arbitrator to have taken the parties' past practice into account once he'd determined the disputed language "clear and ambiguous" "would turn the arbitrator's role and responsibility on its head," citing City Ass'n of Sup'rs &

15

<u>Adm'rs v. State Operated Sch. Dist. of City of Newark</u>, 311 N.J. Super. 300, 312 (App. Div. 1998) (holding arbitrators ignored "the clear and unambiguous language of the agreement concerning the manner in which vacation days were earned . . . [by] add[ing] to the agreement the concept of past practices").

The City appeals, arguing the trial court erred in confirming the award because the arbitrator exceeded his power by ignoring the language of the agreement, and because the terminal leave payment award is against public policy.

Although our reversal of a public sector grievance arbitration award is certainly rare, we think it plain this arbitrator's opinion, which we have quoted at length, cannot stand. We agree with the City that the "arbitrator exceeded his power" within the meaning of N.J.S.A. 2A:24–8(d)[5] by avoiding the import of the parties' thirty-year past practice of not crediting <u>any</u> retiree — regardless

---

[5] N.J.S.A. 2A:24-8(d) states:

> The court shall vacate the award in any of the
> following cases:
>
> . . . .
>
> d. Where the arbitrators exceeded or so imperfectly
> executed their powers that a mutual, final and definite
> award upon the subject matter submitted was not
> made.

of whether they chose the terminal leave or lump sum option — with vacation and personal days once they were no longer coming to work by declaring he found "no ambiguity in the predominant message conveyed by the language chosen, that is, a lump-sum terminal leave retiree is entitled to payment in the amount of 100% of the cost of the traditional terminal leave benefit."

We agree that § 9.09 requires the City to "calculate the CLP for a lump-sum terminal leave retiree to include the same benefits that would have been received by that retiree had he or she . . . elected the traditional terminal leave benefit." The ambiguity arises from the drafters' decision to qualify that statement by providing the lump sum payment is one hundred percent of the City's cost "had the retiree remained on the payroll under the current procedure in lieu of terminal leave." The arbitrator's near single-minded focus on establishing the unambiguity of the parties' agreement in § 9.09 that officers electing a lump sum payment receive the same amount they would have received had they elected the traditional terminal leave option — a proposition the City accepts — elided the critical issue: whether the parties agreed in § 9.09 that an officer electing the lump sum option would not be credited for vacation time and personal days accruing during a terminal leave period "under the [then] current procedure" for retirees taking terminal leave.

A-0015-21

Although our review of a decision on a motion to vacate a grievance arbitration award is de novo, Sanjuan v. Sch. Dist. of W. New York, Hudson Cnty., 256 N.J. 369, 381 (2024), we undertake that review mindful of New Jersey's "strong preference for judicial confirmation of arbitration awards," Middletown Twp. PBA Loc. 124 v. Twp. of Middletown, 193 N.J. 1, 10 (2007) (quoting N.J. Tpk. Auth. v. Local 196, 190 N.J. 283, 292 (2007)). Our Supreme Court has long held "[a]n arbitrator's award is not to be cast aside lightly." Kearny PBA Loc. No. 21 v. Town of Kearny, 81 N.J. 208, 221 (1979). Thus, our review is ordinarily "extremely deferential," PBA, Loc. 11 v. City of Trenton, 205 N.J. 422, 428 (2011), requiring that we confirm a public sector arbitration award "so long as the award is reasonably debatable." Linden Bd. of Educ. v. Linden Educ. Ass'n ex rel. Mizichko, 202 N.J. 268, 276 (2010) (quoting Middletown PBA Loc. 124, 193 N.J at 11).

It is decidedly not the law, however, "that an arbitrator's award is impervious to attack." PBA Loc. 11, 205 N.J. at 429. "Indeed, it is axiomatic that an arbitrator's 'award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse

enforcement of the award.'" Ibid. (quoting United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 597 (1960)).

As our Supreme Court has explained in the context of reviewing a public sector arbitration award, "[t]he polestar of construction of a contract is to discover the intention of the parties." Kearny PBA Loc. No. 21, 81 N.J. at 221. Although there are "[a]ny number of interpretative devices . . . used to discover the parties' intent," including consideration of the specific contractual provision, as well as review of the agreement as a whole and "the circumstances leading up to the formation of the contract," ibid., the Court has observed that "where the meaning of contractual language is doubtful the best guide is furnished by the parties' construction as manifested by their conduct. Journeymen Barbers, Hairdressers & Cosmetologists' Int'l Union of Am., Loc. 687 v. Pollino, 22 N.J. 389, 395 (1956).

Although we agree with the trial court that the City overstates matters by claiming the arbitrator "relied solely on the Zudick Award," it's plain Arbitrator Licata relied heavily on the Zudick opinion and award, and it is what likely led him astray. Article XLIV, section 1 of the firefighters' agreement, unlike § 9.09, does not refer to terminal leave. Article XLIV states:

19

Upon separation from the City, an employee may elect the option of receiving wages and other benefits due them in a lump sum <u>equal to the cost to the City for such wages and other benefits had the employee remained on the payroll to receive same</u>.

[(Emphasis added).]

A clearer and more unambiguous statement of a drafter's intent might be hard to find.

The only analysis Zudick determined he had to undertake, acknowledging that Article XLIV "only concerns the lump sum terminal leave option, not the regular terminal leave benefit," was to "understand the regular terminal leave benefit." Finding the "parties agree[d] that employees choosing the terminal leave benefit remain active employees" on the City's payroll, he concluded "there should be no dispute that they continue to earn both vacation time and personal days during the period their terminal leave time is being used."[6] That retirees opting for the lump sum were likewise entitled to be compensated in an amount "<u>equal to the cost to the City for such wages and other benefits had the employee remained on the payroll to receive same</u>" obviously followed from Article XLIV, leading to an award that required the

_____

[6] The City had indeed disputed the point throughout the proceedings according to Zudick, but changed its position in its post-arbitration brief.

City to calculate the terminal leave of <u>all</u> retiring members of the firefighters' union's bargaining unit — those choosing the traditional terminal leave as well as those opting to receive a lump sum — "by including vacation and personal days earned during the compensation leave period."

Whether that represented the true intent of the parties in light of the City's long history of excluding vacation and personal days that accrued while a terminal leave retiree remained on the payroll, is not for any court to say. <u>See</u> <u>Borough of Carteret v. Firefighters Mut. Benevolent Ass'n, Loc. 67</u>, 247 N.J. 202, 214 (2021) ("affirming an arbitrator's award is not a comment on the viability of opposing interpretations of a disputed labor agreement"). There is simply no question but that Zudick's interpretation of the unmistakably clear language of Article XLIV of the firefighter's contract was a "reasonably debatable" one. <u>See</u> <u>Cnty. Coll. of Morris Staff Ass'n v. Cnty. Coll. of Morris</u>, 100 N.J. 383, 390-91 (1985) ("In the public sector, the scope of review in matters of interpretation is confined to determining whether the interpretation of the contractual language is reasonably debatable"). Indeed, Zudick would not have been <u>permitted</u> to look to the parties' past practice to alter the unambiguous language of Article XLIV. <u>See</u> <u>City Ass'n of Sup'rs & Adm'rs</u>, 311 N.J. Super. at 313.

That Zudick's interpretation of Article XLIV of the firefighter's contract was perfectly reasonable doesn't mean it was a good guide for interpreting the very different language of § 9.09. Arbitrator Licata's task was not so easy as Zudick's. § 9.09, in contrast to Article XLIV, doesn't tie the lump sum option to the cost to the City "for such wages and other benefits had the employee remained on the payroll to receive same"; it instead ties it to "the total cost that the City would have incurred had the retiree remained on the payroll <u>under the current procedure in lieu of terminal leave</u> as provided in 9.04. Four (4) for one (1)." Comparing the language of Article XLIV with that of § 9.09 provides a textbook example of the difference between unmistakably clear language and ambiguous language.

While the "clear and unambiguous" language of Article XLIV permitted Zudick to reasonably conclude that retirees opting for either traditional terminal leave or the lump sum were entitled to those vacation and personal days that were scheduled to accrue during the compensation leave period, the language of § 9.09 would only permit the conclusion, as Arbitrator Licata found, that "the parties plainly agreed to equalize the lump sum terminal leave retiree's monetary benefit and the traditional terminal leave retiree's benefit."

A-0015-21

But finding the parties agreed to equalize the benefits for terminal leave retirees regardless of the option chosen doesn't lead inexorably to the conclusion that either or both were entitled "to pre-retirement CLP credit for the accrual of vacation and personal days"; it doesn't lead anywhere. Just as arbitrators are not permitted to look to the parties' past practice to alter unambiguous language, City Ass'n of Sup'rs & Adm'rs, 311 N.J. Super. at 307–08 (finding arbitrators exceeded their powers by ignoring clear language of the CNA and relying solely on past practice to award unearned vacation benefits to union members), neither can they avoid taking past practice into account by declaring language clear and unambiguous that is obviously anything but, see Folger Coffee Co. v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.-UAW, Loc. Union No. 1805, 905 F.2d 108, 111 (5th Cir. 1990) (finding "[t]he subcontracting clause is neither specific nor unambiguous. Thus, the arbitration panel was entitled to study the other provisions of the agreement, as well as consider other information, such as past practice, which was an integral element in the clause").

Nor was it appropriate for the arbitrator to find clarity by pronouncing the "under the current procedure" language "a distinction without a difference when it comes to the application of the Zudick Award to this matter." Simply

because the language in another contract involving a different bargaining unit, is clear and unambiguous doesn't mean the arbitrator was free to look to it as a gap-filler here.  The arbitrator was obligated to resolve the parties' dispute based on the language they chose in their contract.  He was not free to refuse to consider one party's reasonable interpretation of that language based on another arbitrator's interpretation of different language in a different contract involving a different bargaining unit so as to avoid an "absurd or nonsensical result" here.  Cf. Matter of Ridgefield Park Bd. of Educ., 244 N.J. 1, 23 (2020) (rejecting this court's view "that N.J.S.A. 18A:16-17.2 should be construed contrary to its plain language because the statute would otherwise produce an 'absurd result'" for the four-year CNA the parties' had negotiated).

To be clear, we express no opinion on the meaning of § 9.09.  The parties' bargained for an arbitrator's interpretation of their contract, not ours.  Policemen's Benev. Ass'n v. City of Trenton, 205 N.J. 422, 430-31 (2011).  We hold only that the arbitrator's finding that the language of § 9.09 stating "an employee may elect a lump sum payment of one hundred percent (100%) of the total cost that the City would have incurred had the retiree remained on the payroll under the current procedure in lieu of terminal leave" is clear and unambiguous is not plausible and, thus, not reasonably debatable.  Id. at 430-

24

31. An arbitrator will, therefore, have to consider "the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct," Kearny PBA Loc. No. 21, 81 N.J. 208, 221 (1979), to divine the drafters' meaning. Winslow v. Corp. Express, Inc., 364 N.J. Super. 128, 138 (App. Div. 2003) ("One form of conduct which may manifest the parties' intent is a course of dealing that establishes 'a common basis of understanding for interpreting their expressions and other conduct.'" (quoting Restatement (Second) of Contracts § 223(1) (1981))).

Although our conclusion that the trial court erred in confirming the award is dispositive of the appeal, we reject the City's claim that the terminal leave payment award, which we acknowledge expanded the terminal leave benefit the City has provided its fire officers for the last thirty years without a contract renegotiation, violates public policy. We are well aware of the 1998, 2009 and 2020 reports of the State Commission of Investigation recommending the abolishment of terminal leave. See State Comm'n of Investigation, Pension and Benefit Abuses (1998), http://nj.gov/sci/pdf/pensions1.pdf.; State Comm'n of Investigation, The Beat Goes On: Waste and Abuse in Local Public Employee Compensation and Benefits (2009),

A-0015-21

http://nj.gov/sci/pdf/The-Beat-Goes-On.pdf.; State Comm'n of Investigation,

The Beat Goes On and On: Waste and Abuse in Local Public Employee

Compensation and Benefits (2020), http://nj.gov/sci/pdf/THE-BEAT-GOES-

ON-AND-ON.pdf.

SCI alerted the Governor, the Legislature and the public, first in 1998

and more extensively in 2009 about the

> [c]ostly allocation of various forms of so-called
> "terminal leave," including arrangements that allow
> local public employees to stay on the public payroll,
> using up accrued sick time and other leave at full
> salary and benefits, occupying a position without
> showing up for work — in some cases for up to a year
> — prior to retirement.
>
> [(SCI 2009 Report, at 2).]

The Commission explained that

> [t]ypically, these and other types of lucrative benefit
> arrangements are awarded through collective
> bargaining and carry the force of contracts that often
> apply only to select individuals or groups of municipal
> employees, such as police and fire personnel, to the
> exclusion of all others. . . . In many instances, the
> actual contract language governing the award of
> special benefits is crafted in such intricate, convoluted
> and creatively targeted ways that, much to the
> detriment of public transparency, a good deal of
> technical analysis is required to decipher the true
> purpose and cost. Some of these documents clearly
> bear the stamp of more time spent cultivating private
> rather than taxpayer interests.

26

A-0015-21

[Id. at 5.]

SCI's 2009 investigation

> revealed an elaborate patchwork of local provisions that often enable public employees to remain on the public payroll at full salary and benefits without showing up for work in the weeks and months preceding retirement.  Typically, this is accomplished by using up accumulated leave, usually in the form of many sick days banked over the course of a career. This practice not only forces taxpayers to finance the salaries and benefits of no-show employees whose absence or sick leave is not corroborated by medical certification but it also effectively prohibits local governments from hiring permanent replacements since the positions in question technically are still occupied.  In other instances, leave allotments are converted to cash for payment to employees at retirement.  The Commission recommends that terminal leave, in whatever form it may take, be eliminated for all public employees.

[Id. at 51.]

The Commission conducted a follow-up investigation into the waste and abuse in local public employee compensation and benefits in 2020.  Although noting the State had enacted legislation shortly on the heels of SCI's 2009 report to prohibit "any local government employee hired after 2010 from collecting more than $15,000 for unused sick time at retirement"[7] — the same

---

[7] See N.J.S.A, 40A:9-10.4 and N.J.S.A. 11A:6-19.2.

limit that applies to state government employees — it found terminal leave continued to be a persistent problem across the State's municipalities. SCI 2020 Report, at 4. The Commission particularly noted that "the lack of universal agreement on how to define and cap these payments — which vary from town to town, and sometimes even differ among employment groups within the same government unit — makes it difficult for the public to understand exactly how these payments work and how much they cost." Ibid.

And while noting its past reports had uncovered "that some public workers used terminal leave to remain on the public payroll without showing up for work in the weeks or months before retirement," in its "follow-up inquiry, investigators found it was more common for retiring employees to collect cash rather than take paid time off before departing the public workforce." Id. at 14. The Commission reported "that terminal leave — particularly the type that rewards employees with cash bonuses at retirement — remains a huge expense for many local governments, forcing some to make difficult financial choices in search of adequate funding," and "reiterate[d] the recommendation that terminal leave — in whatever form it may take — be eliminated for all public employees." Id. at 2-3.

More recently, the Office of the State Comptroller has taken up the mantle of reporting on the hidden costs to taxpayers flowing from municipal contracts containing terminal leave provisions. See Off. of the State Comptroller, Investigative Report: An Investigation into the Fiscal Operation of the Borough of Palisades Park 29 (2021), https://www.nj.gov/comptroller/news/docs/palisades_park_final_report.pdf. (describing terminal leave as "really . . . just a large bonus an employee receives at the end of the employee's career"); Off. of the State Comptroller, A Review of Sick and Vacation Leave Policies in New Jersey Municipalities (2022), https://www.nj.gov/comptroller/news/docs/sick_leave_report.pdf. (noting the Legislature's "goal of subjecting local and state employees to the same policies at retirement has not been achieved").

As with any contract, our courts will not enforce a collective negotiations agreement that violates public policy. New Jersey Tpk. Auth. v. Loc. 196, 190 N.J. 283, 294 (2007). But the public policy exception is a narrow one. Borough of E. Rutherford v. E. Rutherford PBA Loc. 275, 213 N.J. 190, 202 (2013). The Court has made clear that "for purposes of judicial review of labor arbitration awards, public policy sufficient to vacate an award must be embodied in legislative enactments, administrative regulations, or

29

legal precedents, rather than based on amorphous considerations of the common weal." Loc. 196, 190 N.J. at 295. Although we would hardly characterize SCI's and the Comptroller's reports as "amorphous considerations of the common weal," as the Union does, those reports exhort the Legislature to end terminal leave for all public employees, acknowledging it is not the current state of the law. Although we are not insensitive to the effect Arbitrator Licata's award would have had on the City and its taxpayers, we cannot find it would violate existing public policy of our State.

Reversed and remanded to the New Jersey State Board of Mediation for the appointment of a new arbitrator to be selected by the parties in accordance with the Board's rules. We do not retain jurisdiction.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0015-21